186 Cal.App.4th 1236 (2010)
113 Cal. Rptr. 3d 163
In re KARLA C., a Person Coming Under the Juvenile Court Law.
SAN MATEO COUNTY HUMAN SERVICES AGENCY, Plaintiff and Respondent,
v.
P.E., Defendant and Appellant;
G.C., Defendant and Respondent.
No. A126685.
Court of Appeals of California, First District, Division Five.
July 21, 2010.
CERTIFIED FOR PARTIAL PUBLICATION[*]
*1241 Seth F. Gorman, under appointment by the Court of Appeal; and David J. Pasternak for Defendant and Appellant.
Michael P. Murphy, County Counsel, and Kimberly A. Marlow, Deputy County Counsel, for Plaintiff and Respondent.
Valerie E. Sopher, under appointment by the Court of Appeal, for Defendant and Respondent.
Law Office of Bonnie L. Miller and Bonnie L. Miller for Minor.

OPINION
BRUINIERS, J.
The juvenile court found that Karla C. (Karla) was at risk of continuing sexual abuse at the hands of a stepfather in the home of her mother, P.E. (Mother), and that Mother had failed to protect Karla from the abuse. The court took jurisdiction over Karla under Welfare and Institutions *1242 Code section 300, subdivision (d) and removed Karla from Mother's physical custody.[1] At the conclusion of a contested disposition hearing, the juvenile court decided to place Karla, at least temporarily, with her father, G.C. (Father), a Peruvian national who lives in Peru. Mother appeals from the juvenile court's disposition orders, contesting the ordered placement of Karla with Father outside the territorial boundaries of the United States. Because it is not clear from the record before us that the juvenile court will have the ability to enforce its continuing jurisdiction over Karla after placement in Peru, we reverse the order and remand for a further hearing to determine the enforceability of the juvenile court's jurisdiction in Peru, and to allow the court to then impose any measures that may be appropriate to ensure that its jurisdiction is maintained.

I. STATUTORY FRAMEWORK
The jurisdictional findings which brought Karla under the court's dependency protection are undisputed, and the only question before us is the propriety of the court's dispositional order which would place Karla with Father.
(1) Before discussing the facts of this case, we first address the governing statute. "The dependency statutory framework distinguishes between a parent with whom the child was residing at the time the section 300 petition was initiated (custodial parent), and a parent with whom the child was not residing at the time the events or conditions arose that brought the child within the provisions of section 300 (noncustodial parent)." (In re V.F. (2007) 157 Cal.App.4th 962, 969 [69 Cal.Rptr.3d 159], fn. omitted, superseded on other grounds as stated in In re Adrianna P. (2008) 166 Cal.App.4th 44, 57-58 [81 Cal.Rptr.3d 918] (Adrianna P.).) "[S]ection 361.2 governs the child's temporary placement with the noncustodial parent and the provision of reunification services to the parents, and also permits the court to grant legal and physical custody of the child to the noncustodial parent." (In re V.F., supra, at p. 969.)
(2) "When a child has been removed from the physical custody of his or her parents under section 361, subdivision (c), the court must place the child *1243 in a safe home or setting, free from abuse or neglect. (§ 16501.15.) . . . Section 361.2 governs placement when the child has a parent `with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300.' (§ 361.2, subd. (a), italics added.) It directs that before the child may be placed in out-of-home care, the court must first consider placing the child with the noncustodial parent, if that parent requests custody. [Citations.]"[2] (Adrianna P., supra, 166 Cal.App.4th at p. 55, fns. omitted.)
The noncustodial "parent has a constitutionally protected interest in assuming physical custody, as well as a statutory right to do so, in the absence of clear and convincing evidence that the parent's choices will be `detrimental to the safety, protection, or physical or emotional well-being of the child.' [Citations.]" (In re Isayah C. (2004) 118 Cal.App.4th 684, 697 [13 Cal.Rptr.3d 198].) Thus, it is the party opposing placement who has the burden to show by clear and convincing evidence that the child will be harmed if the noncustodial parent is given custody. Clear and convincing evidence is evidence that establishes a high probability and leaves no substantial doubt. (In re Jerome D. (2000) 84 Cal.App.4th 1200, 1205 [101 Cal.Rptr.2d 449].) It is "`"sufficiently strong to command the unhesitating assent of every reasonable mind. [Citations.]"' [Citation.]" (Id. at pp. 1205-1206.)
"If the court places the child with the noncustodial parent, the court initially has three alternatives. The court may order the noncustodial parent to assume custody of the child, terminate juvenile court jurisdiction and enter a custody order. (§ 361.2, subd. (b)(1).) It may continue juvenile court jurisdiction and require a home visit within three months, after which the court may make orders as provided in subdivision (b)(1), (2) or (3). (§ 361.2, subd. (b)(2).) Or the court may order reunification services to be provided to either or both parents and determine at a later review hearing under section 366.3 which parent, if either, shall have custody of the child. (§ 361.2, subd. (b)(3).)"[3] (Adrianna P., supra, 166 Cal.App.4th at p. 55, italics omitted.)
*1244 (3) Reunification services are generally required when a child is removed from parental custody. (§ 361.5, subd. (a).) However, when a court places a dependent child with the noncustodial parent pursuant to section 361.2, it has discretion, but is not required, to order reunification services to the formerly custodial parent. (See § 361.2, subd. (b); In re Gabriel L. (2009) 172 Cal.App.4th 644, 651 [91 Cal.Rptr.3d 193]; In re Erika W. (1994) 28 Cal.App.4th 470, 475-478 [33 Cal.Rptr.2d 548] (Erika W.).) "If the previously noncustodial parent can provide a safe and stable permanent home for the child and the evidence establishes that the other parent cannot, reunification services may be offered only to the previously noncustodial parent since this serves the Legislature's goals by placing the child in parental custody and providing for a safe and stable permanent home for the child. . . . [¶] If, on the other hand, the previously noncustodial parent who is now assuming custody does not appear to be an appropriate permanent placement for the child, and the previously custodial parent has the potential to provide a safe stable permanent home for the child, reunification services can be offered to the previously custodial parent in the hope that this parent will remedy his or her deficiencies and reunify with the child. . . . [¶] . . . [¶] . . . `. . . [T]he purpose of reunification services is to facilitate the return of a dependent child to parental custody.' [Citations.] . . . When a child is placed in nonparental custody, reunification services are necessary to promote a possible return of the child to parental custody. However, when a child is placed in parental custody, this goal has already been met and therefore reunification services are not necessary." (Erika W., supra, 28 Cal.App.4th at pp. 476-478, italics omitted.)
(4) In sum, "when a nonoffending noncustodial parent requests custody under section 361.2, subdivision (a), he or she is requesting sole legal and physical custody of a child. However, the court may not immediately grant that parent sole legal and physical custody. The court must first determine whether it would be detrimental to the child to temporarily place the child in *1245 that parent's physical custody. If there is no showing of detriment, the court must order the Agency to temporarily place the child with the nonoffending noncustodial parent. The court then decides whether there is a need for ongoing supervision. If there is no such need, the court terminates jurisdiction and grants that parent sole legal and physical custody. If there is a need for ongoing supervision, the court is to continue its jurisdiction." (In re Austin P. (2004) 118 Cal.App.4th 1124, 1134-1135 [13 Cal.Rptr.3d 616].)

II. FACTUAL AND PROCEDURAL BACKGROUND

Section 300 Petition and Detention Report
On June 24, 2009, the San Mateo County Human Services Agency (Agency) filed a juvenile dependency petition on behalf of Karla, who was born in July 2004. The petition, brought pursuant to section 300, subdivision (d), asserted that Karla was sexually abused by her stepfather, Martin S. It was alleged that Martin S. stroked his penis in front of Karla and asked her to stroke his penis, which she did on three occasions. It was further alleged that Martin S. had "tickled" Karla's vagina, telling Karla not to tell anyone because Mother and Mother's baby would die.[4] When Karla's allegations first surfaced, Mother did not believe her and accused her of telling lies. On June 22, 2009, Karla was placed in protective custody at a shelter care foster home.
The detention report indicated that, at the time of the abuse, Karla lived with Mother, Martin S., the maternal grandmother, and Martin S.'s brother in a one-bedroom apartment. Karla shared a bedroom with Mother and Martin S.[5] The maternal grandmother was told by Karla of the sexual abuse. The maternal grandmother was unsure if she should believe Karla, but shared Karla's disclosures with a mandatory reporter. When Mother was told of the abuse, "[s]he said that she did not believe [Karla] and that she [could] not believe that [Martin S.] would ever do this to her daughter. She said over and over that [Karla] does not know what she is saying and that someone might be telling her to say such lies." When Karla was present in the room, Mother repeatedly asked her why she was saying things that were not true. Mother telephoned relatives in front of Karla, telling them that Karla was lying. Karla appeared frightened and was crying.
*1246 Mother reported that she and Father were never married, that Father was deported from the United States when Karla was one and a half years old, and that Father lived in Callao, Peru. Mother further reported that Father had not paid child support but had spoken with Karla on the phone twice a month when Karla visited her paternal grandmother.
Detention was recommended because of the Agency's concerns about Mother's ability to protect Karla's emotional and physical state. The court ordered Karla removed from Mother's home and detained in shelter care. The court also ordered crisis counseling and supervised visitation with Mother. The first in a series of restraining orders was issued against Martin S.

Jurisdiction/Disposition Report and Determination
The jurisdiction/disposition report noted that Karla continued to be detained in shelter care. It further advised that the social worker had telephone contact with Father, who stated that he and Mother lived together, in Miami, when Karla was born and that he had been deported to Peru when Karla was six months old. Father told the social worker that he had maintained telephone contact with Karla, that Karla visited his mother regularly in Concord, and that, in 2008, she visited him in Peru.
The jurisdiction/disposition report confirmed that Karla told police investigators that Martin S. had asked her to touch his penis on three different occasions and had touched her vagina. The police report was attached, which indicated that, after his arrest, Martin S. admitted asking Karla to touch his penis three times, "but also said there have been many more times." Martin S. also told police that he had taken a shower with Karla and Mother. The detective noted that, when he entered the bedroom to interview Karla at her home, a movie showing two people having sex was playing on the television.
The jurisdiction/disposition report indicated that the social worker had interviewed Mother, who admitted that she did not originally believe Karla and told Karla that she was not telling the truth. However, Mother said that, as of July 21, 2009, she believed "whatever Karla said." Nonetheless, Mother also stated that she blamed Karla's maternal grandmother because "`she let Karla watch Spanish soap opera (novelas) about people being molested by family members and people having sex so she opened up Karla's mind to those kind of things.'" Mother also admitted visiting Martin S. in jail and anticipated some continued relationship with him because she was having his baby. The social worker expressed concern that Mother has been more protective of Martin S. than of her own child. However, the report also noted that Karla and Mother appeared to be bonded and that Karla appeared to be physically well cared for by Mother.
*1247 The report noted that the social worker had conducted a telephone interview with Father. When it was explained why Karla was removed from Mother's custody, Father said he believed Karla and was very concerned about her protection. Father also stated that he wanted to be involved in the dependency proceedings and would like custody of Karla. If this was not possible, Father indicated that he would like Karla placed with his mother or a paternal uncle or aunt. Mother indicated that she wanted Karla returned to her care, but if that was not possible, she would like Karla placed with a maternal relative other than the maternal grandmother. Karla indicated that she wanted to go home with Mother.
The report stated that Karla had begun crisis counseling and supervised visits with Mother. The Agency reported that Mother exhibited difficulty respecting the rules and in controlling her emotions during visitation. However, the Agency also stated that Mother and Karla were affectionate and Karla appeared at ease during visits. The social worker wrote: "[Karla] appears to be a happy child but does seem very confused about why she is not with her mother and states she misses her mother. Since [Karla] has refused to discuss anything about her home and seems to shut down, the undersigned believes [Karla] feels a sense of guilt and she appears very concerned about harming her mother or unborn sibling." Karla's foster mother also observed Karla engaging in sexualized play.
The social worker wrote that "[she] believe[d] that had the disclosure not come to the attention of the Agency, [Mother] would have kept the disclosure a secret, not believe[d] anything [Karla] had stated and continue[d] to have [Martin S.] in the home[.] [T]herefore, returning [Karla] to [Mother's] care would continue to put the child at risk for abuse and neglect." The report continues: "[Mother] states that [Father] has not provided financial support for [Karla] and at this time, [Karla] has not wished to speak with [F]ather by phone even though she has been asked on several different occasions[.] [T]herefore; placing [Karla] with [Father] in Peru would not be in [Karla's] best interest as [Mother] has been the child's primary caretaker all her life."
The social worker provided the following evaluation: "This case is very disturbing as here is a five year old child who disclosed that she was being sexually abused by her step-father and her mother immediately blame[d] her stating . . . she is a liar and making up stories. [Mother] is also more protective of the man who abused her child than her child. [Mother] showed no empathy for [Karla] and her only concern was that [Martin S.] not be prosecuted and then, her immediate family members also concede[d] with her that [Karla's] statements can not be trusted. [Mother's] assertion now that she believes [Karla's] statements is at best, unbelievable as demonstrated by her behavior and statements. She blames Spanish TV shows and the maternal *1248 grandmother for `opening up' [Karla's] mind, and continues to regularly visit [Martin S.] in jail. [Mother] and her family have also been attending the criminal court hearings and appear more concerned with talking to [Martin S.'s] defense attorney than the Assistan[t] District Attorney who is attempting to get justice for [Karla]. The undersigned contends that this is not what a protective patent [sic] would do and [Mother] needs to be educated and informed about the impact of her actions and learn what the inherent responsibilities of a parent truly are which begins with protecting your child no matter what."
The jurisdiction hearing was held on July 29, 2009. Mother admitted the allegations of the petition. The court declared Father to be Karla's presumed father. The court sustained the dependency petition and adjudged Karla to be a dependant of the juvenile court. The court continued the matter to September 2, 2009, for disposition.

First Addendum Report to Jurisdiction/Disposition Report
On September 1, 2009, a first addendum report to the jurisdiction/disposition report was filed by the Agency. The report indicated that the social worker asked Karla if she would like to live with Father. Karla "stated `no' and that she wants to be with her mother and new baby brother." However, Karla stated that she would visit Father with her maternal grandmother.
The report also indicated that the social worker had spoken to Mother about Karla living with Father. The report provided: "[Mother] stated that she has raised Karla all of her life and that [Father] has had limited contact with Karla . . . . [Mother] stated that she does not believe [Father] has steady employment and he has never provided any financial support for Karla since he was deported in 2004. [Mother] also stated that [Father] has a drinking problem and prior domestic violence against her. [Mother] also stated that [Father] repeatedly calls her when he is intoxicated so that is how she knows her [sic] continues to abuse alcohol[.] [Mother] is concerned that Karla would be exposed to [Father's] drinking and [that he] would not be able to provide her with the opportunities that the United States can offer as there are many problems in Peru. [Mother] also stated that all of her family who has been a regular part of Karla's life are [sic] here in the United States and that a great deal of [Father's] family also resides in the United States."
Mother continued to have twice weekly visits with Karla that "continued to go very well." The report stated: "Karla continues to look forward to the visitation and now is very excited as [Mother] will . . . bring her half-sibling to the visits." Karla also continued to have weekly therapy that was "going *1249 well." Karla's therapist, Maria Hernandez (Hernandez), indicated that Karla needed intensive therapy and "to send her to her father in Peru would be further traumatizing."
The report provided the following summary of another telephonic interview with Father: "[Father] stated that he and mother lived together in Miami, Florida in July . . . 2004 when Karla was born. [Father] stated that in November 2004 he was deported back to Peru when [Karla] was just four months old. [Father] stated that after he was deported back to Peru, [Mother] and [Karla] traveled to Peru and stayed with [Father] from December 2004 until March 2005. [Father] stated that [Mother] and [Karla] returned to the United States and then returned to Peru in July 2005 so [Father] could celebrate [Karla's] first birthday with her. [Father] stated that in October 2005 [Karla] and [Mother] returned to the United States. [Father] stated that in 2006 he attempted to reenter the United States illegally again but was detained at the border in Texas. [Father] stated [Mother] and [Karla] may have visited him while he was detained to be deported back to Peru but could not recall any dates. [Father] did not see [Karla] again until September 2008 when [Karla] was four years old because the maternal grandmother took [Karla] to visit Peru. [Karla] stayed with [Father] in Peru during the . . . visit which was from September 2008 until November 2008. [Father] stated that he enrolled [Karla] in pre-school while she was in Peru for two-months and took many photographs of her. [Father] stated that during the nearly three year period he did not see [Karla], he spoke with her two times a month when [Karla] was visiting the paternal grandmother. [Father] conceded that during this time [Karla] was between a year and [a] half and four years old so the telephone conversations were very limited due to [Karla's] young age. [Father] also stated that it is true that he never provided any child support but sent `gifts' to the paternal grandmother to give to [Karla]."
The Agency obtained information from the California Law Enforcement Telecommunication System (CLETS) that showed Father had been arrested, on September 16, 1999, for petty theft and again, on February 14, 2001, for burglary and as a fugitive from justice. Father's deportation documents showed the following: (1) an arrest for larceny, on October 27, 2000, with a conviction on April 7, 2001; (2) charged with flight/escape, on September 22, 2001, with an unknown disposition; (3) an arrest for assault and larceny, on November 21, 2001, with an unknown disposition; (4) an arrest for assault and two counts of larceny, on May 8, 2002;[6] (5) an arrest, on July 6, 2002, for driving under the influence, with a later conviction; (6) charged with flight/escape on August 7, 2002; (7) an arrest for a probation violation, on August 19, 2002; (8) charged with a second probation violation, on August 26, 2002; (9) an arrest for battery, on April 30, 2003, with an unknown *1250 disposition; (10) an arrest, on August 1, 2004, for trespassing and resisting an officer, with the disposition being pretrial diversion; (11) an arrest, on November 7, 2004, as a deportable alien.
The report provided the following assessment: "[Mother's] over all demeanor has continued to improve as she is more cooperative and states she is eager to begin services. Despite [having] given birth recently, [Mother] is willing to begin and participate in the Agency's Parent Education Class and wants to begin individual therapy and be a part of the services Karla is receiving. All of this is positive, however, it can not be ignored that for the majority of the time this case has been investigated, [Mother] was aligned with the perpetrator as she was visiting him on a regular basis and minimizing the allegations. [Mother] needs services in order to truly come to terms with the disclosure of the child and address her damaging reaction of denying the allegations and blaming [Karla] despite the perpetrator's confession. Also, she has just given birth to the perpetrator's child and needs services around placing strict boundaries if she is to continue some kind of relationship regarding the newborn and needs to be assessed as time passes that she will be protective of Karla.
"[Father] has maintained contact with the Agency and it appears he is truly concerned about [Karla]. However, the [social worker] is concerned that [Father] lacks the understanding of the trauma [Karla] has been through and of [Karla's] needs as he has focused on only what he wants to occur. . . . It would not be in [Karla's] best interest to send her to Peru where [Father]'s ability to provide [for] and support [Karla] is unknown and there does not appear to be any services comparable to intensive services that [Karla] needs and can be provided within the United States. Also, [Karla] has stated that she wants to be returned to her mother and newborn half-sibling and if that is not possible at this time, she has many extended family members who are available to care for her such as [a maternal cousin and his wife] who are eager to care for Karla and have an understanding of the time and commitment needed. Therefore, it is respectfully recommended that [Karla] be made a Dependent in out of home placement and that the Court grant the [Agency] discretion to place [Karla] with [the maternal cousin and his wife.] It is also respectfully recommended that [M]other and [F]ather be offered Family Reunification Services."

Second Addendum Report to Jurisdiction/Disposition Report
On September 1, 2009, the Agency filed a second addendum report to the jurisdiction/disposition report. The report attached a written report from Karla's therapist, which provided: "In my assessment of Karla, I have observed sexualized play in play therapy, which is indicative of sexual abuse *1251 and concurs with CPS findings. She is also showing aggressive behaviors and sexualized play towards younger children as reported by foster mom. . . . [¶] Therapist's findings thus far indicate that: [¶] 1. Child needs weekly individual play therapy to help her process trauma and freely express herself. [¶] 2. Child needs a safe, consistent, loving home where stability is provided. [¶] 3. Child needs to be believed, heard around the traumatic events to help decrease shame and guilt. [¶] 4. Mother needs psycho education about child abuse, how to respond appropriately to child's behaviors and how to keep child safe, both emotionally and physically. [¶] 5. Child needs to maintain healthy relationships with extended family, which were previously in place, as well as continued supervised visits with her mother. [¶] It is imperative to the well being of [Karla] that she receives the aforementioned in a consistent manner, maintaining continuity of care with care-providers. Any major transitions at this time need to be therapeutically supported so as to minimize the potential retriggering of traumatic responses that are acute in relation to her coping."
On September 2, 2009, the court ordered an interim placement with a maternal cousin and continued the matter for a contested disposition hearing on October 29, 2009.

Third Addendum Report to Jurisdiction/Disposition Report
On October 27, 2009, the Agency filed a third addendum report to the jurisdiction/disposition report. The Agency reported that Karla liked living with a maternal cousin and his wife and appeared to have closely bonded with them. "Karla has no major difficulties adjusting to her new placement and she rarely cry's [sic] for her mother as she previously had at the former foster placement. Karla appears happy and well cared for . . . ."
With respect to Mother's progress, the Agency observed that Mother's demeanor and openness to services continued to improve and Mother had been attending parent education classes regularly and begun therapy. Mother asserted that she had not been visiting Martin S. and will not be in a relationship with him because she wants Karla returned to her custody as soon as possible. The parenting class instructor related that Mother's "`overall progress has been slow' in regards to participation in the class and talking about why she is attending the class other than being court ordered." Based on his experience, "`usually by the half way mark, parents have disclosed at least some part about why they are there.'" However, Mother had not so disclosed, while all the other participants had. The parenting class instructor also indicated that, during a class exercise in which the students were asked about their family strengths, Mother had spoken primarily about Martin S., saying that he "is a good man, a hard worker and that she wants her family back together." Thus, Mother appeared to remain very aligned with Martin S.
*1252 Mother had only attended two therapy sessions, but Mother's therapist stated that Mother "has been cooperative and engaged in the therapy process and seems open to working on the CPS issues that brought her into treatment." Mother's therapist also indicated that "[Mother] has demonstrated high motivation to engage in treatment so she can process what has happened to her daughter and be protective of her daughter and her son."
The Agency had also had further contact with Father. Father "appeared to be trying to understand his child's needs more and more . . . . [Father] wants the Court to know that he only has Karla's best interest at heart and is willing to do whatever is needed to care for her and get her the help she needs." With respect to Father's living situation, the report observed: "[Father] lives in Callao, Peru which is part of the metropolitan area of Lima, Peru. [Father] lives with his girlfriend . . . and there [sic] ten month old child . . . . A paternal aunt . . . also lives in the home. [Father] stated that he and his Aunt rent a home and each pays half of the rent. The home is reportedly a two-story, four bedroom house. [Father] stated that he works at the Port of Callao in import/exports. He stated that he works full-time, Monday thru Friday . . . but often works over time. The [social worker] asked [Father] to provide written verification of his employment which as of the writing of this report the [social worker] has yet to receive. However, [Father] did provide the [social worker] with verification of completion of receiving a license in order to work as an import/exporter at the port." Father also stated that Karla's paternal grandmother receives a pension in Peru and gives that money (approximately $500 per month) to him, which could also be used to care for Karla. Father also reported that his girlfriend does not work and would be Karla's caretaker while he is at work.
The social worker asked Father if he had located therapy providers for Karla. Father responded that he had found "Accion por los Ninos." The social worker looked up the organization on the Internet and discovered that the organization's goal is to establish legislation and programs to prevent children from being exploited, abused, or neglected. The Web site did not mention services for children who have been abused. Father also told the social worker that he had located a parenting class at a church that he planned to take. The social worker stated: "[Father] has also continued to try to speak as often as possible to Karla and always ha[d] positive messages to relay to her; however [Karla] continue[d] to be unresponsive, refusing to speak with [Father]."
A written report from Karla's therapist was again provided. It states: "[Karla] has started processing trauma, evidenced by sexualized play, talk of the police coming to her home, re-peating [sic] messages her mother has given her about step father (that he loves her and is at work). She expressed *1253 her anger and frustration in [two] recent sessions, evidence that she is starting to feel safe in [the] therapeutic relationship. [¶] . . . [¶] Based on my therapeutic treatment of [Karla], it is my clinical impression that [Mother] is not ready to validate or believe that her child was sexually abuse[d] and thus not prepared to help [Karla] heal from this trauma and it's [sic] many emotional, physical and psychological effects. This is based on reports from the social worker on the case, messages [Mother] has been giving [Karla] (that [Martin S.] loves her and that he's at work and is coming home). [Karla] disclosed this to therapist and showed her a drawing [Mother] made of [Martin S.] and her, [M]other asked [Karla] to color it." Because of Mother's inability to validate Karla's experiences, Karla's therapist had not begun "dyad" therapy with Mother and Karla.
The therapist's report continued: "Karla has been showing symtoms [sic] of acute trauma: (1) wetting her bed (2) reinacting [sic] abuse experience in play therapy and sexualized behaviors (3) waking up from nightmares (4) throwing herself on the floor (5) crying, sadness (6) refusing to get in and out of the car when being transported to visits (7) complaining that her private parts itch and hurt. . . . And (6) [sic] talking about [Martin S.] (per [M]other's messages) and about the police coming to her house. All of these symptoms denote how fragile [Karla] is at this time. To move her to another countryto a father she has had very little contact with, away from the family she knows and who are providing a supportive, consistant [sic], loving environment for her in which she can begin healingwould be highly traumatizing to her. This would exacerbate her symptoms, and [Karla] would internalize this as further punishment, that the abuse and being moved are her fault. She has already internalized guilt and shame over the abuse, and this would further reinforce it. The psychological ramifications would be great because she is already showing full blown acute traumatic stress. Thus, it is this therapist's clinical conclusion that it would be highly detrimental for [Karla] to be moved out of the country, away from the supportive systems which are already in place, from the family members she loves and who are providing healthy experiences for her."
The addendum report concluded with the following assessment: "The hope of the [social worker] is to not further traumatize [Karla] by moving her to Peru, to her father, who by all means has very good intentions but who Karla has not been raised by because of the distance that separates them and who Karla[] does not appear to have a close bond to. Karla needs to be able to benefit completely from the intensive services she is receiving and from also residing in [a] place where she feels comfortable and safe and is able to explore her feelings regarding what she has endured. . . . [¶] At this time, the [social worker] can not say with certainty that [Mother] will be able to have Karla safely returned to her care as her progress has been marginal. . . . Only *1254 time will tell what permanent changes and decisions [Mother] makes including if she will really not be in a relationship with the perpetrator. [¶] The recommendation of the [Agency] for [Karla] to not be placed with [Father] in Peru has nothing to do with [Father's] motivation or devotion to care for his child but because of [Karla's] current needs and emotional state which is critical at this time. [¶] [Father] should receive information, therapeutic services and parent education as available in Peru to learn more about children who have been sexually abused and how to care for them in case [Karla] is placed in his custody in the future. Therefore, it is respectfully recommended that [Karla] be made a Dependent Child of the Court in out of home placement and that both parents receive Family Reunification services."

Contested Disposition Hearing
At the contested disposition hearing, on October 29, 2009, both Mother and the Agency opposed placement with Father. Karla's therapist, Hernandez, testified as an expert in the treatment of childhood trauma.[7] Hernandez testified: "The best way I can describe where Karla is right now is a child in ICU. She is experiencing this trauma, and this trauma has been exacerbated by the disbelief and the . . . lack of support from her mom. [¶] And, thus, to move her when she is in a place right now where she is receiving structure, she is receiving loving care, . . . they have a schedule for her. She started school. To move a child who has already been moved twice, at this point, would just be retraumatizing her because she doesn't fully understand why she's been moved. [¶] I mean, she blames herself at this point. She doesn't understand why she's going from place to place. So it would just exacerbate the symptoms I mentioned. [¶] I would expect that those symptoms would increase, to go to a place that she's only been to a couple of times to a family she doesn't know very well. [¶] Whereas here she has the support of people she knows and the support systems are in place. [¶] So at this time I think it's too fragile to move her anywhere."
Hernandez continued: "My concern is you're sending a child . . . who is highly traumatized, who is right now in the middle of trauma, to live with someone she doesn't know very well in a country she doesn't know very well, away from the support system that's providing really good care, excellent care at this present moment." However, Hernandez testified that she would be concerned even if Father did not live out-of-state.
Hernandez further testified that Karla was currently unstable, but that it was possible that she would be in a better place in the future to move to her father. Hernandez said: "My opinion is that when she is more stable and she *1255 has had the opportunity to have corrective experiences, whichwhat I mean by that is she's validated; she's had a chance to process the trauma as children do, and she is in a caring, stable home, and that, that would be a better time. [¶] Would there be a transition? Absolutely. [¶] Would there be some trauma? Yes. [¶] But my professional opinion is that would be less than the trauma now, if she were to be moved at this time." Hernandez stated: "From my experience of working with children who have been sexually abused, . . . when they stay in treatment and they are provided with a loving, caring support system where the adults in her life understand, validate, believe her, and give her what she needs, over time these children do stabilize."
On cross-examination by Karla's counsel, Hernandez testified that "having supervised visits where [Mother] understands how to relate to Karla is what Karla needs to reduce her symptoms. [¶] That would be more beneficial to her; to have her mom validate her, be loving to her, be with her, and do so in a way that's therapeutic. That would be more beneficial to healing her trauma than not seeing her mom."
Hernandez also stated that she had never spoken with Father and could not speak to his abilities. When asked how familiar she was with the services available in Peru, Hernandez responded: "I'm not assuming that [Father] would be able to provide her consistency and validation and support." (Italics added.) When asked whether Father and his family could provide the support necessary to stabilize Karla, Hernandez responded: "I don't know that he can or can't." The court asked Hernandez, "[L]et's assume [Mother] will never validate her. If she has a caregiver who does, can [Karla] get better and improve?" Hernandez responded: "Yes. Research shows that children do. We have many cases to show that." Hernandez was also asked, "If Karla is residing with her father, and he provides her with love and care and validation, and mother still is unable to come to terms with the abuse, would the father's support be sufficient to aid Karla in her healing?" Hernandez responded: "It would help her to have a kind of support."
The Agency also called the social worker who had spoken with Father at least seven times. The social worker testified that "[b]ased on talking to Karla, also trying many times to get her to speak with [Father], my conclusion is that there is not a bond between Karla and [Father]." The social worker further testified: "I believe [Father's] intentions are very good. He made it clear he loves [Karla] dearly. [¶] My concern is I talked to him on several occasions, trying to explain what Karla's needs are. [¶] There have been several occasions where he basically has pushed the fact that, `No. She's going to be fine. She's okay.' [¶] So during our last interview, I asked him, I said, `[Father], let's say that Karla is placed in Peru with you. Let's *1256 say that she's acting out. She's having a lot of behaviors. She's crying. She wants her mom. She wants her baby brother. She misses her grandparents. She doesn't understand why she's there, you know? What are you going to do?' [¶] And he basically said, `No. No. No. No. That's not going to happen. I know my daughter. That's not going to happen.'" The social worker testified that she had concerns about Father's ability to meet Karla's needs, "based on [their] conversation and what [she] believe[s] is a lack of insight that he's able to have regarding Karla's current state and what situations may arise."
The social worker testified that Karla has "never been hesitant about visiting [Mother]; always very excited and has had, at times has had a very hard time separating from her. [¶] But the interaction throughout the visit is very good." The social worker also testified that Mother "has become a lot more open. She is accepting direction from me a lot better, without being or seeming kind of standoffish. She's asking questions and communicating a lot more." The social worker testified that continued visitation between Mother and Karla was important. However, Mother's progress towards reunification was characterized as "slow" and "marginal."
Father appeared by video conference and testified that he wanted Karla to live with him. Father testified that he lived in Callao, Peru, which is a safe suburb of Lima that has a children's park and a school nearby. Father testified that he had space for Karla in his three-bedroom home, in which he had lived for five or six years with his girlfriend and aunt. Karla could share a room with his ten-month old daughter, Daniela.[8]
Father also testified that, when Karla visited him for about two and a half months in 2008, he spent a lot of time with Karla and that Karla "wanted to be with [him] all the time." Father said that Karla "learned a lot of new things while she was going to school here" and that he had a large family nearby, including many children. Father testified that he had worked in customs at the port for the last two years. The job provides enough money for Father to be able to support his family and have some extra money. Father also noted that his mother has agreed to provide some additional monetary support if Karla were to come live with him.
Father stated that he planned to enroll Karla in a school where they also speak English if she came to live with him. Father also said he had made inquiries about Accion por los Ninos, where they give counseling and therapy to children who have been abused. Father stated: "I know that what [Karla] *1257 has gone through is very serious, and I want to continue the treatment that she already started . . . ." Father also testified that, from the first time he read the allegations, he had always believed his daughter. He believed that Karla will need a lot of help from him and his family and he is willing to give her all the help she needs. Father said he would be able to help Karla "[b]ecause [he] love[s] her from the bottom of [his] heart, and [he] know[s] [his] daughter." When asked why he wanted Karla to come live with him, Father testified: "Because I miss her. I miss her a lot. And because of what is the painful situation that she is going through, and to not be able to be by her side because of my situation, that's why I want to be with her."
Father said: "Whatever my daughter needs, I'm going to give it to her; time, patience . . . ." On cross-examination, Father admitted that he had previously attended anger management classes in connection with a domestic violence conviction. Father also conceded that he had not paid any child support for Karla over the past five years, despite the fact that he had been regularly employed for the past two years. When asked if he had a name for a therapist at Accion por los Ninos that would be able to see Karla, Father responded: "No, I don't have a name. I don't have a name because . . . my daughter has to be present for the type of therapy that they're going to give her here." Father also testified that he did not think Karla would be traumatized by moving to his home "[b]ecause all the affection that the family has here . . . and I know that it will help her a lot."
The court also questioned Father, as follows:
"Are you and your girlfriend prepared to handle bed wetting on a fairly regular basis, if that were to occur?
"A Yes.
"Q Were you aware that that has been a problem?
"A No, I didn't know.
"Q Are you prepared to handle behavior that could be described as sexualized behavior for a child of Karla's age?
"A Yes. Because of what you're telling me, I know that I need a lot of therapy for [Karla]. And because of that, I am going to do whatever is within my reach to help her.
"Q Now, I have lived in Latin America, and I know that, at times, there is a lot of reservation about discussing things of this nature with other people.
*1258 "Are you willing to discuss any of these issues with your family members who would have contact with Karla, so they would understand some problematic conduct that might occur?
"A Yes, I am willing to do that.
"And all my close relatives who know about this are willing to give me all the support.
"Q My concern is that if Karla, in the future when she's older, senses that this is a subject that is taboo, then she might develop a sense of shame about what she had no control over; something that happened to her that she might feel it's secret and shameful. I wouldn't want to see that happen.
"(Spanish spoken) And that it's not a shameful thing.
"A I understand what you're telling me. That's why I think I would need some therapy, some parenting classes also, to be able to help my daughter."
It was stipulated that Father's girlfriend, Father's stepmother, and Father's aunt would all testify "they had an opportunity to observe [Father] with Karla; that he was a loving father, that he provided care for her, and that he made sure she was safe. [¶] They would also testify that should Karla come to Peru, they would do what they could to make sure she healed." Numerous photographs, reflecting Father's visits with Karla and his home in Peru, were also admitted into evidence.
During argument, Karla's counsel questioned whether it would really be better to have Karla remain where she is and then send her to Father at some later date. Karla's counsel ultimately urged the court to place Karla with Father, relying on "the legislative policy [that] is always so strongly in favor of the parents . . . ." Father's counsel made a similar argument. In contrast, Mother's counsel and the Agency maintained that Karla would suffer detriment if moved to Peru, and thus, should not be placed with Father. Mother's counsel also noted: "I'm focusing on what I think is a practical concern; and that is, once [Karla] is in Peru, we have essentially made a definitive and final decision. [¶] . . . [¶] The law says you have not, your Honor. But I would be more than a bit surprised if there were any practical mechanism to exercise any oversight of a child placed in Lima, Peru. [¶] . . . [¶] Once it's done, . . . you say you do and can retain jurisdiction. As a practical matter, it will be difficult to effectuate any order from here once [Karla] is there. [¶] I think, at the very least, . . . it behooves us to have [a home] study done before taking any such action."
*1259 County counsel for the County of San Mateo (County Counsel), attorney for the Agency, pointed out: "[F]rom a practical standpoint, if [Karla] is moved to Peru right now, today, the ability of [Mother] to reunify with her child is basically gone." County Counsel also stated: "I don't know from a legal standpoint whether the Court would have the authority to bring [Karla] back from Peru over [Father's] objection. . . . [¶] . . . [¶] . . . It's an issue of right now, at this very moment, there is clear and convincing evidence that [Karla] will suffer detriment if the bond with [Mother] is permanently severed and [Karla] is moved before [Mother] has an opportunity to at least attempt to address, in therapy, what's going on with her daughter and the daughter has an opportunity, through therapy, to at least stabilize."

Placement Order
The court concluded "that the evidence fails to show that placement with Father would be detrimental to [Karla]." In announcing its ruling, the court stated: "The standard of proof per all the case law is clear and convincing evidence; not do I sort of think [detriment] might happen and not is it even probable that [the placement] will be damaging? [¶] Is there clear and convincing evidence that it will? The evidence fails as to showing detriment in my view, factually. [¶] . . . [¶] I could find nothing in [Father's] testimony and in the vigorous cross-examination that would indicate any detriment whatsoever of any kind; that's whether he lived in Oakland or Fresno or Lima, Peru. [¶] On the other hand, in spite of [Karla] being placed with loving caregivers since September 11th, her behavior has been up and down. Her symptomatology has increased, and the more contact, it seems, with mother in the one unsupervised moment in time, the parenting classes, is when things devolve. [¶] . . . [¶] I see the detriment in not doing what I'm about to do. [¶] I agree with [Karla's counsel] that this is a matter of weighing some hurt now versus the definite chance for lots and lots of heartache along the way that might or might not result in a happy ending. [¶] I'm finding, absolutely, that I cannot make the finding of detriment."
In its written orders of October 29 and 30, 2009, the court removed Karla from Mother's physical custody, ordered placement with Father in Peru, no later than November 15, 2009, and retained jurisdiction. The court's written orders also provide that "[s]ole physical & legal custody" of Karla was granted to Father.[9] The court ordered the Agency, within three months, to *1260 complete and submit a report with an update on the placement and Karla's status. The court also provided: "Father shall keep the [Agency] notified of [Karla's] therapist's name and the treatment schedule. Father is to sign any waivers of confidentiality so that the [Agency] may be kept informed of [Karla's] status in therapy and other services." The court also ordered "a transitional good-bye visit" with Mother, as well as a therapy session for Karla, a session with her current caregivers, and a session with the person that will accompany Karla to Peru. Mother filed a timely notice of appeal.[10]

III. DISCUSSION
Mother contends that the juvenile court's placement order must be reversed because (1) the court's finding of no detriment is unsupported by substantial evidence; (2) no home study or other evaluation of Father's home was completed before the placement; and (3) the court abused its discretion by making insufficient provisions for the enforceability of its continuing jurisdiction after Karla is placed in Peru. Father has filed a respondent's brief urging us to affirm the juvenile court's orders.[11] In the unpublished portion of our opinion we reject Mother's first two arguments. In the published portion of our opinion we agree that the court must consider if additional measures are necessary or appropriate to ensure its continuing jurisdiction and remand for that purpose.
*1261 A., B.[*]

C. Did the Court Abuse Its Discretion by Placing Karla with Father Without Ordering Measures to Enforce Its Continuing Jurisdiction?

Finally, Mother argues that "the trial court abused its discretion in ordering the transfer of [Karla] to Peru subject to its continuing jurisdiction without any contact with Peruvian officials and without any legal assurances that it could effect the return of [Karla] to California if needed or that it could preserve its effective jurisdiction over the dependent child in Peru."
(5) California's juvenile dependency law does not prohibit placement of children outside of the United States. (In re Sabrina H. (2007) 149 Cal.App.4th 1403, 1412 [57 Cal.Rptr.3d 863] ["we decline to apply the maxim expressio unius est exclusio alterius to the Welfare and Institutions Code and thereby read an implicit ban on placing dependent children in foreign countries"].) And Mother concedes that no published dependency case has held that a juvenile court abuses its discretion by placing a child subject to its continuing jurisdiction with his or her noncustodial parent in a foreign country absent protective measures.[16]
Nevertheless, Mother relies on several family law custody cases involving international relocation to support her argument that necessary prerequisites to such placements include assurances that the juvenile court can still maintain effective jurisdiction over the minor and that Karla would be returned if the court so ordered.[17] In the primary opinion relied on by Mother, *1262 the Second District Court of Appeal declared that "before permitting any relocation which purports to maintain custody and visitation rights in the nonmoving parent, the trial court should take steps to insure its orders to that effect will remain enforceable throughout the minority of the affected children." (In re Marriage of Condon (1998) 62 Cal.App.4th 533, 547 [73 Cal.Rptr.2d 33], italics added (Condon); see also In re Marriage of Abargil (2003) 106 Cal.App.4th 1294, 1299, 1303-1304 [131 Cal.Rptr.2d 429] (Abargil); In re Marriage of Lasich (2002) 99 Cal.App.4th 702, 719, fn. 9 [121 Cal.Rptr.2d 356] (Lasich).)
In Condon, a mother sought to return to her native Australia with her two children after dissolution and child custody proceedings were decided in the California family courts, where the family had resided for several years. (Condon, supra, 62 Cal.App.4th at pp. 536-541.) The parents had been temporarily awarded joint legal and physical custody of the children. (Id. at pp. 538, 550.) The trial court concluded that while each parent was fit and "`it would be in the children's best interest to spend significant periods of unmonitored time with each parent . . . it was also in their best interest that [the mother] be allowed to reestablish her residence in Australia.'" (Id. at pp. 539-540.) Accordingly, the custody order provided that the children were to spend the school year with their mother in Australia, and spend their four school vacation periods with their father in California. (Id. at p. 540.) The children's father appealed. (Id. at p. 541.)
The reviewing court began by recognizing that, in In re Marriage of Burgess (1996) 13 Cal.4th 25 [51 Cal.Rptr.2d 444, 913 P.2d 473], the Supreme Court announced that a parent with primary physical custody may relocate unless the other parent demonstrates the move would be contrary to the child's best interests. (Condon, supra, 62 Cal.App.4th at pp. 535, 542-543.)[18] However, the court noted three concerns that distinguish international relocations from intrastate or interstate relocations. "First, the cultural problem. In some cases, to move a child from this country to another is to subject him or her to cultural conditions and practices far different from those experienced by American citizens or to deprive the child of important *1263 protections and advantages not available in the other country. . . . [¶] Second, the distance problem. . . . For a person of average income or below, an order relocating his or her child to a faraway foreign country is ordinarily tantamount to an order terminating that parent's custody and visitation rights. [¶] Third, and most difficult, is the jurisdictional problem. California court orders governing child custody lack any enforceability in many foreign jurisdictions and lack guaranteed enforceability even in those which subscribe to the Hague Convention on the Civil Aspects of International Child Abduction[, October 25, 1980, T.I.A.S. No. 11670]. Thus, the California courts cannot guarantee any custody and visitation arrangements they order for the nonmoving party will be honored." (Id. at pp. 546-547, italics added.) The reviewing court emphasized that a trial court confronted with a parent's request to relocate a child internationally should consider all three of the above factors in determining the "best interests of the child." (Id. at p. 547.)
The Condon court also stated: "Finally, before permitting any relocation which purports to maintain custody and visitation rights in the nonmoving parent, the trial court should take steps to insure its orders to that effect will remain enforceable throughout the minority of the affected children. Unless the law of the country where the children are to move guarantees enforceability of custody and visitation orders issued by American courts, and there may be no such country, the court will be required to use its ingenuity to ensure the moving parent adheres to its orders and does not seek to invalidate or modify them in a foreign court." (Condon, supra, 62 Cal.App.4th at pp. 547-548, italics added.)
In Condon, the reviewing court refused to interfere with the trial court's order allowing the relocation, concluding that "the careful balance the trial court struck . . . could be reasonably found to serve the best interests of the Condon children." (Condon, supra, 62 Cal.App.4th at p. 554.) However, the court noted: "The delicate balance the trial court struck depends on [the mother] placing her two boys on flights to Los Angeles four times a year and resisting the temptation to move away once again . . . . Meantime [the mother] once before defied the order of a California court by secretly transporting her children to Australia and keeping them there without allowing [their father] any access until the Australian courts ordered their return under mandatory provisions of the Hague Convention . . . ." (Ibid.) The children's father presented authority showing that enforcement of the family court's orders in Australia could be problematic, but that registration of the California order with the Australian courts would provide some measure of protection. (Id. at pp. 541, fn. 9, 556-557, 559-560.) The court also observed that "the Hague Convention protects a custodial parent from unlawful removal or retention of minor children for only one year" and that "the court of the requested state . . . is not bound to order the return of the child if the person opposing its return establishes the parent requesting return `was not *1264 actually exercising the custody rights at the time of the removal or retention, or had consented to or subsequently acquiesced in the removal or retention' or `there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.' [Citation.]" (Id. at p. 556 & fn. 22.)
Because "[i]t [was] possible, although not probable, an Australian court with less stake in the children's relationship with a California father would consider it against the best interests of those children to require them to travel eight thousand miles . . . four times a year," the court concluded that "a custody order which is guaranteed enforceability for only 1 year of the remaining 10 to 12 years of minority represents an abuse of discretion by the issuing court." (Condon, supra, 62 Cal.App.4th at p. 561.) The court noted: "Such an order does not adequately protect the interests of this state's citizen, the father, in maintaining a relationship with his children, nor does it adequately preserve the policies this state's Legislature has declared should govern child custody arrangements." (Ibid.) After concluding the order would not have guaranteed enforceability in the Australian courts, the court remanded to the trial court to obtain the mother's concession of continuing jurisdiction in the California courts and to create sanctions calculated to enforce that concession. (Id. at pp. 535, 562.) The trial court was instructed to create sanctions, which "should include the posting of an adequate monetary bond within [the mother's] means and the potential forfeiture of all or some support payments upon proof [the mother] is disregarding essential terms of the court order or has violated the concession of jurisdiction by pursuing modification of the California order in the courts of Australia or any other nation." (Id. at p. 562.)[19]
In Abargil, supra, 106 Cal.App.4th 1294, and Lasich, supra, 99 Cal.App.4th 702, similar protective measures were imposed to ensure the enforceability of the family court's custody orders in an international move-away context. In Abargil, a mother obtained a custody order that allowed her to move to Israel with her son. (Abargil, supra, 106 Cal.App.4th at pp. 1296, 1298.) The trial court ordered the mother to register the order in the Israeli courts and to similarly file her stipulation consenting to the judgment and California's continuing jurisdiction. She was also required to post a bond to ensure her compliance. (Id. at p. 1300.) Nonetheless, the father, who only had visitation rights, claimed on appeal that "California's custody orders are nullities in foreign lands, making registration of the judgment in Israel meaningless." (Abargil, supra, 106 Cal.App.4th at p. 1300.) The reviewing court concluded that the father had abandoned his claim because it was made without citation *1265 to any authority. Furthermore, the mother's expert on Israeli law noted that Israeli law permits parties to agree to be bound by a foreign judgment and then file their agreement with an Israeli court as an Israeli judgment. (Id. at pp. 1300-1301.)
Although the father had shown no error, the case was remanded, in the interests of justice, to ensure that adequate protections for enforceability were in place. The trial court was directed to modify its judgment on remand to ensure the following: "First, it shall require [the mother] to post a substantial financial bond in a specific amount sufficient to ensure her compliance with the court's judgment and orders. [Citation.] [¶] Second, it shall prohibit [the mother] . . . from attempting to modify the judgment except upon application to a California state court. [Citation.] . . . [¶] Finally, [the mother] must register the trial court's judgment with the proper Israeli authorities before she may take [the child] to Israel. Until the judgment is registered, the stay barring [the child's] departure from California shall remain in place." (Abargil, supra, 106 Cal.App.4th at pp. 1303-1304.)
In Lasich, a mother successfully petitioned to move with her children from Sacramento to Spain. (Lasich, supra, 99 Cal.App.4th at pp. 704-705, 710.) The trial court's custody order provided the father with eight weeks of "parenting time" every summer, one week at Christmas, one week at spring break, and up to two weeks in Spain. (Id. at p. 711.) The order also conditioned the relocation on the mother's registration of the custody order under the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. No. 11670 (Convention) and the mother's annual acknowledgement in the Spanish courts that the children remained habitual residents of California. The mother also conceded that California retained exclusive jurisdiction to make any custody order and was required to post a $100,000 bond, which would be forfeitable if she sought to modify the order in the courts of any other country. (Lasich, at pp. 712-713.) On appeal, the reviewing court rejected the father's argument that the trial court failed to comply with the guidelines of Condon, supra, 62 Cal.App.4th 533. With respect to enforceability of jurisdiction, the court concluded that "[t]he court . . . heeded Condon by imposing rigorous jurisdictional terms to ensure its orders will be enforceable in Spain." (Lasich, at pp. 718-719 & fn. 9.) No abuse of discretion was shown. (Id. at p. 720.)
(6) There are obvious differences between this dependency proceeding and the custody disputes at issue in Condon, Abargil, and Lasich. First, in the cited cases, neither parent had suffered a removal. "The family court is established to provide parents a forum in which to resolve, inter alia, private issues relating to the custody of and visitation with children. In that setting, parents are presumed to be fit and capable of raising their children. [Citation.] *1266 The juvenile court, by contrast, provides the state a forum to `restrict parental behavior regarding children, . . . and . . . to remove children from the custody of their parents or guardians.' [Citation.]" (In re Chantal S. (1996) 13 Cal.4th 196, 201 [51 Cal.Rptr.2d 866, 913 P.2d 1075], brackets added.) Thus, in Condon, Abargil, and Lasich, protective measures were necessary to ensure the nonmoving parent's continuing custody or visitation rights. (See, e.g., Condon, supra, 62 Cal.App.4th at p. 561.) Here, on the other hand, the question is Mother's ability to assert custodial or visitation rights once Karla is in Peru. The disposition orders do not provide her with any such rights.
Further, unlike the Condon, Abargil, and Lasich courts, we are not concerned with an order that requires enforceability throughout the remainder of Karla's minority. Section 361.2 specifically contemplates the possibility that dependency jurisdiction will be terminated within a short period after placement with a noncustodial parent. (See § 361.2, subd. (b)(1)-(3).) Here, one year of guaranteed enforceability would be sufficient to maintain the court's jurisdiction for the six months of continuing jurisdiction contemplated by the orders at issue. Finally, Mother has presented no authority, either to the juvenile court or on appeal, questioning Peru's willingness to accept and enforce the juvenile court's order. Mother simply asks us to presume that Peruvian courts will disregard the California juvenile court's jurisdiction.
This highlights our concern that Mother did not preserve the arguments she currently raises on appeal. During argument at the disposition hearing, Mother's counsel only asserted a vague "practical concern" that it would be "difficult to effectuate any order from here once the child is [in Peru]." After the juvenile court announced its finding of no detriment, Mother specifically advocated for the court's continuing exercise of jurisdiction, but did not argue that any particular mechanisms were needed to ensure the continuing enforceability of that jurisdiction.[20] Needless to say, Mother cites Condon, Abargil, and Lasich for the first time on appeal.
Thus, we could well conclude that Mother has forfeited the issue, or invited any error, with respect to the necessity of protective measures to *1267 ensure continuing jurisdiction. (See County of Los Angeles v. Southern Cal. Edison Co. (2003) 112 Cal.App.4th 1108, 1118 [5 Cal.Rptr.3d 575] ["doctrine of invited error prevents a party from asserting an alleged error as grounds for reversal when the party through its own conduct induced the commission of the error"]; In re Christopher B. (1996) 43 Cal.App.4th 551, 558 [51 Cal.Rptr.2d 43] ["[i]n dependency litigation, nonjurisdictional issues must be the subject of objection or appropriate motions in the juvenile court; otherwise those arguments have been waived and may not be raised for the first time on appeal"]; In re Kevin S. (1996) 41 Cal.App.4th 882, 885-886 [48 Cal.Rptr.2d 763].) The court was initially inclined to order Father as Karla's legal and physical custodian and terminate its jurisdiction.[21] Had the court elected to do so, we would not be concerned with the preservation of its continuing jurisdiction. Furthermore, had Mother raised Condon, Abargil, or Lasich in the juvenile court, the court may well have considered entry of different orders.
(7) It is difficult to fault the juvenile court for failing to order protective measures to ensure its continuing jurisdiction when it was not asked to do so. We are nevertheless concerned that the trial court has ordered a minor subject to its dependency jurisdiction placed abroad without any apparent consideration of its ability to make or enforce any further orders that may be necessary or appropriate. "[T]he underlying purpose of dependency law is to protect the welfare and best interests of the dependent child. [Citations.]" (In re Luke M. (2003) 107 Cal.App.4th 1412, 1424-1425 [132 Cal.Rptr.2d 907].) Should problems with the placement arise, or should the court determine that Karla should be returned to Mother's custody, and the juvenile court is unable to effect her return to California, Karla's welfare would be jeopardized. Because Mother raises an important legal issue and the interests of justice weigh in favor of consideration, we will not pass the issue. (See In re S.B. (2004) 32 Cal.4th 1287, 1293 [13 Cal.Rptr.3d 786, 90 P.3d 746] ["the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue"], superseded by statute on other grounds as stated in In re S.J. (2008) 167 Cal.App.4th 953, 962 [84 Cal.Rptr.3d 557]; Abargil, supra, 106 Cal.App.4th at p. 1303.)
Although Condon, Abargil, and Lasich are clearly not binding authority in this context, they do highlight a concern of at least equal magnitude in a dependency case such as thiswhether the orders under consideration will become a nullity once the child is abroad. It may be argued that the issue is *1268 of greater concern where the juvenile court serves in loco parentis in protecting the interests of the minor. However, unlike the Condon court, we have no basis to conclude, or even assume, that the juvenile court's orders would lack enforceability or be disregarded in the Peruvian courts. (Condon, supra, 62 Cal.App.4th at pp. 535, 562.) And, we cannot heed Mother's pleas to direct the trial court to impose the prophylactic measures adopted by the Condon, Abargil, and Lasich courts because we lack any information as to what effect such measures might have in Peru. Nonetheless, simply relying on Father's word that he will honor the juvenile court's jurisdiction if the court orders Karla's return places compliance in Father's hands, rather than under the court's control, and abdicates the court's responsibility.
Nor are we persuaded that either the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA; Fam. Code, § 3400 et seq.) or the Hague Convention ensure the juvenile court's jurisdiction over Karla once placed in Peru.
(8) "It is well settled in California that the UCCJEA is the exclusive method of determining subject matter jurisdiction in custody disputes involving other jurisdictions. [Citations.]" (In re Marriage of Sareen (2007) 153 Cal.App.4th 371, 376 [62 Cal.Rptr.3d 687], italics added.) The UCCJEA applies to juvenile dependency proceedings. (In re Stephanie M. (1994) 7 Cal.4th 295, 310 [27 Cal.Rptr.2d 595, 867 P.2d 706]; Fam. Code, § 3402, subd. (d).) Under the UCCJEA, California courts have jurisdiction to make child custody determinations when California is the "home state" of the child on the date of commencement of the proceeding.[22] (Fam. Code, § 3421, subd. (a)(1).) We may accept that California's juvenile courts would be entitled, pursuant to the UCCJEA, to continue exercising jurisdiction over this case even after Karla is in Peru. (See Grahm v. Superior Court (2005) 132 Cal.App.4th 1193, 1200 [34 Cal.Rptr.3d 270] ["the original state retains continuing exclusive jurisdiction as long as the parent who is exercising visitation rights still lives in that state and the relationship between that parent and the child has not deteriorated to the point at which the exercise of jurisdiction would be unreasonable"]; In re Claudia S. (2005) 131 Cal.App.4th 236, 246 [31 Cal.Rptr.3d 697] [Cal. juvenile court could exercise jurisdiction over children who lived in Cal. for at least six months before leaving to visit grandmother in Mexico, despite fact not physically present in state when dependency petition filed].) However, the UCCJEA provides no assurance that the sovereign Peruvian courts would agree and recognize California's *1269 continuing exclusive jurisdiction either as a matter of comity or under treaty. None of the cases cited by Father shed any light on this issue.
(9) More relevant is the Convention.[23] Father asserts that Peru is a signatory to the Convention. And Mother appears to concede as much.[24] "The objects of the . . . Convention are[¶] a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and [¶] b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." (Convention, art. 1.) The Convention accomplishes these objectives by requiring the country to which the child has been removed to return a wrongfully removed or retained child to his or her country of habitual residence, unless the removing party establishes an exception or defense to return. (Convention, arts. 12, 13, 20.) Article 16 also provides that the judicial or administrative authorities of the country to which the child has been removed "shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention . . . ." (Convention, art. 16.)
"The removal or retention of a child is to be considered `wrongful' pursuant to the Convention where it breaches the petitioner's rights of custody, provided that the petitioner was exercising those rights at the time of the retention or removal. [Citations.] . . . [¶] If the petitioner succeeds in showing a wrongful removal or retention, the court must order the child's return to the country of habitual residence unless the respondent demonstrates that one of four exceptions applies. [Citations.]" (In re Marriage of Forrest and Eaddy (2006) 144 Cal.App.4th 1202, 1211 [51 Cal.Rptr.3d 172].)
Mother concedes that California is Karla's "habitual residence" under California's interpretation of the Convention. However, Mother asserts that she may be unable to seek return of Karla under the Convention or that she may be unable to enforce visitation rights under the Convention. We need not address these arguments because they were raised for the first time in Mother's reply brief. (Julian v. Hartford Underwriters Ins. Co. (2005) 35 *1270 Cal.4th 747, 761, fn. 4 [27 Cal.Rptr.3d 648, 110 P.3d 903]; Tilton v. Reclamation Dist. No. 800 (2006) 142 Cal.App.4th 848, 864, fn. 12 [48 Cal.Rptr.3d 366].)[25] Furthermore, we are only concerned with the court's ability to effect return of Karla under the Convention. The parties have not pointed us to any authority, and we know of none, involving a juvenile court's ability to petition for return of a child under the Convention, nor have they suggested any mechanism by which a California court could do so.
(10) Mother also argues that one of the exceptions provided in Convention article 12, article 13, or article 20 could be used to deny Karla's return. "Under the Convention, a person claiming a child has been wrongfully removed or retained may file a petition in an appropriate court where the child is located requesting the child's return. [Citations.] If the court determines the child has been wrongfully removed or retained, the court must order the child's return subject to some narrowly construed exceptions, including when the return of the child would expose the child to a grave risk of physical or emotional harm, or otherwise place the child in an intolerable situation. (Convention, arts. 12 & 13; 42 U.S.C. § 11603(e)(2).) The court may also decline to order the child's return if the child objects to being returned and the child's age and maturity make it appropriate for a court to consider the child's views. (Convention, art. 13.) Similarly, if a petition is filed more than a year after the child's wrongful removal or retention, the court may decline to order the child's return if the child is now settled in the child's new environment. (Convention, art. 12.)" (Bardales v. Duarte (2010) 181 Cal.App.4th 1262, 1270 [104 Cal.Rptr.3d 899].) Father, on the other hand, contends that none of the exceptions would bar Karla's return during the duration of her dependency. Both engage in pure speculation. On this record, we can only conclude that Karla's return to the United States would not necessarily be guaranteed under the Convention.
(11) Thus, the interests of justice require remand to the juvenile court for its consideration of (1) evidence regarding recognition and enforcement of the juvenile court's continuing jurisdiction under the laws of Peru and (2) imposition of any measures necessary or appropriate to ensure enforceability of the juvenile court's continuing jurisdiction and its orders while Karla is outside the United States.[26]

*1271 IV. DISPOSITION
The matter is remanded for further proceedings as described above. On remand, the juvenile court is also directed to clarify, in its revised disposition orders, that Father has been awarded temporary physical custody rather than sole legal and physical custody. In all other respects the juvenile court's orders are affirmed. The parties are to bear their own costs on appeal.
Simons, Acting P. J., and Needham, J., concurred.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III.A. and III.B.
[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code. Section 300, subdivision (d), provides: "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] . . . [¶] (d) The child has been sexually abused, or there is a substantial risk that the child will be sexually abused . . . by his or her parent or guardian or a member of his or her household, or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse."
[2] Section 361.2, subdivision (a), provides: "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (Italics added.)
[3] Section 361.2, subdivision (b), provides: "If the court places the child with [the noncustodial] parent it may do any of the following: [¶] (1) Order that the parent become legal and physical custodian of the child. The court may also provide reasonable visitation by the noncustodial parent. The court shall then terminate its jurisdiction over the child. The custody order shall continue unless modified by a subsequent order of the superior court. The order of the juvenile court shall be filed in any domestic relation proceeding between the parents. [¶] (2) Order that the parent assume custody subject to the jurisdiction of the juvenile court and require that a home visit be conducted within three months. In determining whether to take the action described in this paragraph, the court shall consider any concerns that have been raised by the child's current caregiver regarding the parent. After the social worker conducts the home visit and files his or her report with the court, the court may then take the action described in paragraph (1), (3), or this paragraph. However, nothing in this paragraph shall be interpreted to imply that the court is required to take the action described in this paragraph as a prerequisite to the court taking the action described in either paragraph (1) or paragraph (3). [¶] (3) Order that the parent assume custody subject to the supervision of the juvenile court. In that case the court may order that reunification services be provided to the parent or guardian from whom the child is being removed, or the court may order that services be provided solely to the parent who is assuming physical custody in order to allow that parent to retain later custody without court supervision, or that services be provided to both parents, in which case the court shall determine, at review hearings held pursuant to Section 366, which parent, if either, shall have custody of the child."
[4] Mother was pregnant at the time and gave birth to Karla's half brother in August 2009.
[5] Mother also admitted having sexual relations with Martin S. while Karla was asleep in the same bed.
[6] The assault charge was "Nolle Prossed" and the larceny charge was dismissed.
[7] However, Hernandez stated that this was her first case with an international component.
[8] Father's girlfriend also has a daughter that is one year older than Karla. She lives with her father but comes to stay on weekends and during holidays.
[9] Although neither party contends that the court intended to make a final order of sole physical and legal custody, the juvenile court's written orders are internally inconsistent. The court's oral orders are also in conflict with an order of sole physical and legal custody. At the conclusion of the hearing, the court said "I'm declaring dependency, retaining jurisdiction, and placing [Karla] with her father in Peru forthwith." This made clear that the court was selecting the option found in section 361.2, subdivision (b)(2). "The Legislature did not define what it meant by `custody' in section 361.2, subdivision (b)(2). However, in the context of that subdivision, the term `custody' necessarily means `placement,' i.e., temporary physical custody, because the court is continuing its jurisdiction over the child." (In re Austin P., supra, 118 Cal.App.4th at p. 1131, fn. 2.) On the other hand, it is implicit in the meaning of "sole legal and physical custody" that the parent has the "exclusive right to control decisions about the child and to have possession of the child." (Id. at pp. 1130-1131.) Thus, the court's orders suggest both a temporary and permanent placement with Father. The courts of appeal have reached differing conclusions regarding which order controls when a juvenile court's oral pronouncements differ from its written order. (See, e.g., In re Aryanna C. (2005) 132 Cal.App.4th 1234, 1241 & fn. 5 [34 Cal.Rptr.3d 288] [oral pronouncement prevails over conflicting written order]; In re Jerred H. (2004) 121 Cal.App.4th 793, 798 & fn. 3 [17 Cal.Rptr.3d 481] [juvenile court's written order terminating parental rights controlled over contrary oral pronouncements at hearing]; In re Jennifer G. (1990) 221 Cal.App.3d 752, 756, fn. 1 [270 Cal.Rptr. 326][to extent "court's oral pronouncement differed from its written order, the written order controls"].) Because the court's written orders are internally inconsistent, in that they provide for both sole legal and physical custody to Father as well as "placement" with Father and continuing jurisdiction, we conclude that the court's oral pronouncement prevails.
[10] On November 9, 2009, Mother filed a petition for writ of supersedeas or, in the alternative, writ of mandate. We denied the petition for writ of mandate, but granted the petition for writ of supersedeas and stayed the superior court's orders of October 29 and 30, 2009, to the extent the court ordered Karla transported to Peru and placed in Father's home, pending resolution of the current appeal.
[11] County Counsel filed a letter stating the Agency's intent to not file a respondent's brief because the orders at issue on appeal were contrary to its recommendations.
[*] See footnote, ante, page 1236.
[16] Numerous cases have addressed international placements in the dependency context, but none have addressed the argument raised by Mother here. (See In re Joshua S. (2007) 41 Cal.4th 261 [59 Cal.Rptr.3d 460, 159 P.3d 49]; In re Sabrina H., supra, 149 Cal.App.4th 1403; In re Angelica V. (1995) 39 Cal.App.4th 1007 [46 Cal.Rptr.2d 295]; In re Rosalinda C. (1993) 16 Cal.App.4th 273 [20 Cal.Rptr.2d 58].) Furthermore, none of these cases involved placement with a noncustodial parent pursuant to section 361.2.
[17] We need not address in any detail the supersedeas cases, on which Mother also relies to support her argument. These cases involve maintenance of the status quo while an appeal is pending. (In re Adolfo M. (1990) 225 Cal.App.3d 1225, 1229 [275 Cal.Rptr. 619]; In re Wanomi P. (1989) 216 Cal.App.3d 156, 163 [264 Cal.Rptr. 623]; In re Manuel P. (1989) 215 Cal.App.3d 48, 72-73 [263 Cal.Rptr. 447]; Mills v. County of Trinity (1979) 98 Cal.App.3d 859, 861 [159 Cal.Rptr. 679]; People ex. rel. S. F. Bay etc. Com. v. Town of Emeryville (1968) 69 Cal.2d 533, 536-537 [72 Cal.Rptr. 790, 446 P.2d 790]; Denham v. Martina (1962) 206 Cal.App.2d 30, 32-33 [23 Cal.Rptr. 757]; see also Lerner v. Superior Court (1952) 38 Cal.2d 676 [242 P.2d 321] [writ of prohibition]; Foster v. Superior Court (1935) 4 Cal.2d 125 [47 P.2d 701] [writ of prohibition].) We have already effectively preserved appellate jurisdiction by granting Mother's petition for writ of supersedeas. Mother's reliance on In re M.M. (2007) 154 Cal.App.4th 897 [65 Cal.Rptr.3d 273] is also misplaced. In that case, this division held that transfer of a dependency case from California juvenile court to tribal court, and the tribal court's acceptance of jurisdiction, deprived the California courts of jurisdiction over the dependency case. (Id. at pp. 901, 906.) There has been no transfer of the juvenile dependency case before us. Mother appears to rely only on our statement that "[b]ecause the Karuk tribe is a separate sovereign, we could no more compel its courts to comply with our orders than we could compel the courts of a foreign state or nation to do so. [Citations.]" (Id. at p. 913, italics added.)
[18] See In re Marriage of LaMusga (2004) 32 Cal.4th 1072, 1078 [12 Cal.Rptr.3d 356, 88 P.3d 81] ("noncustodial parent bears the initial burden of showing that the proposed relocation of the children's residence would cause detriment to the children, requiring a reevaluation of the children's custody").
[19] We note that Father here has expressed concerns about the financial burdens of a bond requirement and that he has qualified for appointed counsel based on his limited financial means.
[20] After announcing that the court would not make a finding of detriment, the court and the parties engaged in the following colloquy: "[THE COURT:] Now the question is: Do I follow [section 361.2, subdivision (b)] (1) or (2)? [¶] (3) is out. [¶] I'm inclined, because of [County Counsel's] comments, that it would be so very difficult for the [Agency] to monitor, to follow option (1), but I'm prepared to listen to any dissent as to that and to change my indicated if anyone wants to address that issue? [¶] . . . [¶] [MINOR'S COUNSEL:] Your Honor, as counsel for the child, I would like to see the Court follow subsection (2), to ensure that therapy gets in place, that [Father] is able to find a parenting class that will address the specific needs of his child, and to ensure that we can get whatever their HSA department in Peru is on board to maybe transfer the case to that agency. [¶] [MOTHER'S COUNSEL:] I would agree that among the options, that would be preferrable [sic] . . . ." (Italics added.)
[21] We note that termination of jurisdiction would actually eliminate the risk of termination of Mother's parental rights. (See In re Sarah M. (1991) 233 Cal.App.3d 1486, 1491 [285 Cal.Rptr. 374], disapproved on other grounds by In re Chantal S., supra, 13 Cal.4th at p. 204.)
[22] "`Home state' means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. . . ." (Fam. Code, § 3402, subd. (g).)
[23] In the United States, the Convention is implemented by the International Child Abduction Remedies Act (42 U.S.C. § 11601 et seq.).
[24] Our own research indicates that Peru acceded to the Convention on June 1, 2007, and that the United States has recognized Peru's accession. (U.S. Dept. of State, Bur. of Consular Affairs, Hague Abduction Convention Country List [as of July 21, 2010].) "The distinction between accession and ratification is that only nations that have ratified the Convention can be considered signatories under Article 37. Accession, by contrast, binds a country only with respect to other nations that accept its particular accession under Article 38." (Gonzalez v. Gutierrez (9th Cir. 2002) 311 F.3d 942, 945, fn. 2, abrogated on other grounds by Abbott v. Abbott (2010) 560 U.S. ___ [176 L.Ed.2d 789, 130 S.Ct. 1983].)
[25] Likewise, we need not address the numerous opinions that Mother cites for the first time in her reply brief. Suffice it to say, however, that they do not address the question presented here.
[26] At minimum, the juvenile court should require Father to expressly concede the juvenile court's jurisdiction throughout the pendency of the dependency case, as Father has indicated he is willing to do.