Filed 7/14/15  In re B.P. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re B.P. et al., Persons Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH & SOCIAL SERVICES DEPARTMENT,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>C.P.,<br><br>　　　Defendant and Appellant. | A142679<br><br>(Solano County<br>Super. Ct. Nos. J40436, J41019) |

　　　C.P. (Father) appeals from juvenile court orders terminating his reunification services to his two daughters, B.P. and B.F.P., at the contested six-month review hearing pursuant to Welfare and Institutions Code section 366.21, subdivision (e).[1]  He contends the court erred by applying the wrong analysis as to whether there was a substantial probability the children could be returned to his custody by the 12-month review hearing. He also asserts that although the 12-month review hearing was only one month away, he had made substantive progress in his case plan and shown he could reunify with his daughters.  We affirm.

_____

[1] All further statutory references are to the Welfare and Institutions Code.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

## I.    *Background*

Father and C.P.2 (Mother) were married in 2004.  Together they have two girls, B.P. (age nine) and B.F.P. (age four).  Mother has two older children from previous relationships, I.N. (age 10) and B.K. (age 17).  B.K. lived with Mother and Father, while I.N. lived with her father in Texas and stayed with Mother in the summer only.

Beginning in 2002, the Solano County Health and Social Services Department (Department) had been involved with the parents on five occasions due to substantiated allegations of domestic violence, and substance and alcohol abuse.  They fought in front of the children, and had both been arrested for domestic violence and child endangerment.  On one occasion Mother stabbed Father with scissors while cutting I.N.'s hair.  The Department did not remove the children from the parents' custody at that time because they immediately engaged in voluntary services.

## II.    *The First Dependency Proceeding*

The Department became involved with the family again in September 2010 when Mother was about eight months pregnant with B.F.P.  On September 18, 2010, Mother was arrested for felony domestic violence and for possession of controlled substances.  Father sustained scratches to his face and a busted lip.  The parents had argued over Father's excessive drinking, a habit that caused him to be arrested for public intoxication in March 2010.

Based on the most recent domestic violence incident, the Department filed a petition on October 18, 2010, alleging B.K. (then 12 years of age) and B.P. (then four years of age) were at substantial risk of harm under section 300, subdivisions (b) and (c) due to the parents' history of domestic violence and substance abuse.[2]

On November 16, 2010, the juvenile court found the allegations as stated in an amended petition to be true following a contested jurisdictional hearing.  The children remained in the home and the parents were offered family maintenance services.

---

[2] The allegations concerning section 300 subdivision (c) were subsequently dismissed.

Mother gave birth to B.F.P. in December 2010.

At the December 21, 2010 disposition hearing, the juvenile court ordered B.K. and B.P. to remain in the parents' custody with family maintenance services.

On August 9, 2011, the Department filed a petition alleging B.F.P. was at substantial risk of harm under section 300 due to the parents' domestic violence, Mother's substance abuse, and Father's alcohol abuse. The Department also concurrently filed a section 387 petition as to B.K. and B.P., alleging the same facts. Reportedly, Father was continuing to abuse alcohol and marijuana, and had also engaged in domestic violence with Mother. The children were detained and placed in foster care.

On November 8, 2011, the juvenile court ordered B.P. and B.F.P. returned to Mother's custody with family maintenance services for both parents.[3]

On September 18, 2012, the juvenile court terminated jurisdiction and granted the parents joint legal custody. Mother was given primary physical custody. Father was ordered not to operate a motor vehicle with the minors in the car, and to refrain from having contact with the minors after consuming alcohol.

### III.    *The Present Dependency Proceeding*

On May 17, 2013, the Department filed a section 300 petition as to B.K., B.P., and B.F.P. Both parents had recently been arrested and charged with child cruelty, and possession of controlled substances and drug paraphernalia. Reportedly, law enforcement had gone to Mother's home following an anonymous tip and had discovered methamphetamine on a desk in her room. Both parents were in possession of pipes, and Father had a digital scale in his pocket. There was rotten food on the floor, an open bleach bottle in the bathroom, and a broken crib in the room where the children slept.

On May 22, 2013, the juvenile court ordered the children detained. Mother and Father were granted supervised visits once a week for two hours.

According to the June 13, 2013 jurisdiction/disposition report, B.P. and B.F.P. were placed with a nonrelated extended family member who had previously babysat the

---

[3] The parents had separated some time prior to May 2012.

3

girls.[4]  By this time, the parents were no longer incarcerated.  Mother reported she currently did not use drugs and explained the drug paraphernalia found in the house was old and was not recently used.  However, she admitted she smoked marijuana regularly and predicted she would test dirty for methamphetamines.  She did not believe her home was unsafe or unsanitary.

Father reported he did not live with Mother and the girls, but visited regularly.  He admitted he would test dirty for marijuana and alcohol.  He was unwilling to contact the behavioral health assessment team for an intake appointment, claiming he worked for the government and his work schedule would not accommodate any classes.  He also failed to drug test.  He admitted there was domestic violence with Mother in the past, but denied any current domestic violence.

An addendum report filed on July 31, 2013, indicated Mother had been hospitalized for her mental health issues.  Her preliminary diagnosis was recurrent major depression.  Mother disclosed alcohol, marijuana, and methamphetamine use.  Father had visited his two girls and wanted to have custody of them, but did not currently have space for them.  He planned on divorcing Mother.  In the Department's view, Father "seems to struggle in understanding the severity of the current dependency matter and the importance of his full participation."

On August 2, 2013, the parents submitted to jurisdiction.  Mother and Father were ordered to participate in reunification services.  Father was to participate in a parenting program, random drug testing, and a substance abuse assessment.  The parents were granted supervised visits once a week for at least one hour.

In a status review report filed on January 14, 2014, the Department reported Mother had been hospitalized twice and was arrested on August 30, 2013, due to a bench warrant.  She was released in September 2013 after pleading guilty to a felony charge.  She was on probation and was required to complete services.  Reportedly, she appeared delusional and was not taking her psychotropic medications.  Father tested positive for

---

[4] B.K. was placed with her paternal relatives.

marijuana on September 27, 2013. He was arrested on October 4, 2013, for possession of known stolen property. He appeared intoxicated at the time of his arrest.

Mother and Father blamed each other for their children's removal. Father had filed for divorce and claimed to be looking for appropriate housing for him and the girls. While incarcerated, he enrolled in a recovery program. He was reportedly actively engaged in the program. Before his arrest, he did not enroll in any parenting education programs; however, he had participated in weekly counseling services at the jail since November 2013. From August through October he missed five weekly visits with his children, and had not had any visits since his incarceration. When he did visit, he was usually appropriate and engaged with his children.

In the Department's view, parental progress toward alleviating or mitigating the causes necessitating out-of-home placement had been minimal. The children had encountered significant trauma and instability in their young lives, and B.P. had demonstrated several concerning behaviors, including sexualized behaviors and physical aggression. Although Father actively engaged in services while in custody, from May 2013 to his arrest in October 2013, he did not demonstrate any behavioral or cognitive changes. Nor did he engage in the court-ordered services. Neither parent appeared to understand why the Department was involved in their case or the negative impact their conduct had on their children. The Department recommended termination of reunification services as to both parents.

On March 6, 2014, the court granted the Department's section 388 petition requesting Father's visits with the children be suspended while he was incarcerated. Father agreed and did not want his daughters to visit him while in jail.

The six-month review hearing was continued several times at Mother's and Father's trial counsel's requests.

At the contested sixth-month review hearing, held on June 17 and 18, 2014, the supervising social worker testified Mother was initially noncompliant with her case plan but had been actively engaged in a residential treatment program since March 2014. Father was only "semi-compliant" with services. He did engage in a recovery program

5

that included a variety of services, including substance abuse and parenting classes, while incarcerated. He had recently been released from jail, and he contacted the social worker several days after his release. Nevertheless, the Department recommended termination of services as to Father because he had been unwilling to engage in services during the months prior to his incarceration. Additionally, the 12-month hearing date (July 15, 2014) was approaching and there was not a substantial probability that the children could be returned to the parents' care even if services were extended to the 12-month date.[5]

Father testified he participated in a recovery program while incarcerated. The program included services to address anger management, coping skills, trigger management for drug addiction, and parenting classes. The program met for eight hours a week, and he participated in it over a 90-day period. He also participated in therapy with intern psychologists. He planned to attend 12-step meetings and obtain a sponsor. He also planned on raising the girls with the support of his parents, the current foster parent and other immediate family members. However, he currently lived at a homeless shelter.

After hearing testimony and closing arguments, the juvenile court found that Mother had made substantial progress and granted her additional services to the 12-month review date. The court found Father had not made substantial progress and there was not a substantial probability the children would be returned to him by the 12-month date, which was only one month away. The court indicated it was not impressed with Father's efforts while incarcerated because there were no treatment records to corroborate his testimony. The court also was not impressed by the fact that he had prioritized his work over visitation with his children prior to his incarceration. The court terminated Father's reunification services, stating: "I'm going to find that there wasn't sufficient

---

[5] Section 361.49 provides: "Regardless of his or her age, a child shall be deemed to have entered foster care on the earlier of the date of the jurisdictional hearing held pursuant to Section 356 or the date that is 60 days after the date on which the child was initially removed from the physical custody of his or her parent or guardian." Here, the children were removed from custody on May 15, 2013. The 12-month period thus began running on July 15, 2013.

6

progress to make a substantial . . . probability that the kids would be returned to him by the one-year deadline, so I am going to go ahead and order reunification services be terminated for the father." The court also reduced Father's supervised visits from once a week to twice a month.

A status review report filed for the 12-month hearing reported that Father was currently residing in a shelter. He had a successful visit with his children on July 1, 2014, and was scheduled for another visit at the end of the month. The Department renewed its recommendation to terminate reunification services as to Mother and to set the matter for a section 366.26 permanency planning hearing.

On August 5, 2014, the 12-month hearing was continued to September 3 and 4, 2014. That same day, Father filed a notice of appeal from the orders rendered on June 18, 2014.

## DISCUSSION

### I.    *Standard of Review*

We review findings made under section 366.21 for substantial evidence. (*James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1020.) "We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or evaluate the weight of the evidence. Rather, we draw all reasonable inferences in support of the findings, view the record most favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary conclusion. [Citation.] The appellant has the burden of showing the finding or order is not supported by substantial evidence." (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.)

The juvenile court's decision regarding whether to extend reunification services to the 12-month hearing is reviewed under an abuse of discretion standard. (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 179–180.) The court's exercise of discretion will not be disturbed in the absence of an arbitrary, capricious, or patently absurd determination. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

## II. Termination of Reunification Services

### A. Contentions

Father does not contend that reasonable services were not provided. Instead, he asserts the juvenile court applied the wrong legal standard when it terminated his services at the six-month hearing. He claims the court erroneously believed it lacked discretion to extend his services. He points to the court's statement at the contested six-month review hearing, in which the court determined there was "not a substantial probability that the kids *would be* returned to him by the one-year deadline . . . ." (Italics added.) Father asserts the court erroneously applied the higher substantial probability of return analysis used at 12-month reviews instead of the more lenient six-month review standard contained in section 366.21, subdivision (e). He also claims that had the juvenile court applied the correct legal standard it is reasonably probable his reunification services would have been continued to the 12-month review hearing. The Department disagrees, arguing substantial evidence supports the court's finding there was not a substantial probability that the siblings could *or* would be returned to Father's custody by the July 15 twelve-month review date. We agree with the Department.

### B. Governing Principles

"When a child is removed from a parent's custody, the juvenile court ordinarily must order child welfare services for the minor and the parent for the purposes of facilitating reunification of the family. (§ 361.5, subd. (a).)" (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843.) If a child is over the age of three when removed from parental custody, a parent generally is entitled to a minimum of 12 months of reunification services, whereas a parent of a child who is under the age of three at the time of removal generally is entitled to only six months of services. (§ 361.5, subd. (a)(1)(A)–(B).) In the case of a "sibling group" that includes children in both age categories at the time of removal, the juvenile court may limit services with respect to all siblings to six months. (§ 361.5, subd. (a)(1)(C); *Abraham L. v. Superior Court* (2003) 112 Cal.App.4th 9, 13–14.) That is the case here, as the two girls are considered a sibling group and B.F.P. was two years old at the time of removal.

8

The parties agree that the June 2014 hearing at which the juvenile court terminated Father's services, which was originally scheduled for January 30, 2014, was a six-month status review hearing subject to the standards of section 366.21, subdivision (e). Under that subdivision, if the court finds at the six-month review hearing that the parents have failed to participate regularly and make substantive progress in a court-ordered treatment plan, it may terminate services unless it also finds *a substantial probability the child may be returned* to the parents within the next six months. (§ 366.21, subd. (e).) If the court makes the latter finding, it must continue the case to the 12-month review hearing. (*Ibid.*; *M.V. v. Superior Court, supra,* 167 Cal.App.4th at pp. 179–180.)

Permanency planning begins at the 12-month "permanency hearing," which is governed by subdivision (f) of section 366.21. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 974.) At that hearing, the dependency court is once again tasked with determining whether the child can be safely returned to parental custody and whether "reasonable services that were designed to aid the parent or legal guardian to overcome the problems that led to the initial removal and continued custody of the child have been provided or offered . . . ." (§ 366.21, subd. (f).) If the child is not returned to parental custody at the 12-month permanency hearing, the dependency court has several options. Relevant here is the option set forth in section 366.21, subdivision (g)(1), pursuant to which the dependency court may: "Continue the case for up to six months for a permanency review hearing . . . . The court shall continue the case only if it finds that there is a *substantial probability that the child will be returned* to the physical custody of his or her parent . . . within the extended period of time or that reasonable services have not been provided to the parent or legal guardian. . . ." (§ 366.21, subd. (g)(1), italics added.)[6]

---

[6] Alternatively, the dependency court may: "Order that a hearing be held within 120 days, pursuant to Section 366.26, but only if . . . there is clear and convincing evidence that reasonable services have been provided or offered to the parents or legal guardians. . . ." (§ 366.21, subd. (g)(4).)

### C. The Juvenile Court's Ruling Was Not an Abuse of Discretion

Father asserts the juvenile court applied the more stringent 12-month hearing substantial probability that the child "*will* be returned" standard found in section 366.21, subdivision (g)(1) when it terminated his reunification services, as opposed to the less stringent "*may* be returned" standard found in section 366.21, subdivision (e). Although the juvenile court's remarks regarding its discretion are somewhat confusing, they do not establish the court failed to apprehend that it had discretion to continue services to Father. In particular, we note the court did exercise its discretion to extend Mother's services. It also did not make any reference to section 366.21, subdivision (g)(1). A reasonable interpretation, based on the record as a whole, is that the court believed it would be an abuse of discretion to extend services to Father in this case.

The purpose of reunification services is to place the parents in a position to gain custody of the child. (*In re Karla C.* (2010) 186 Cal.App.4th 1236, 1244.) While the juvenile court noted Father's recent efforts to comply with his case plan, it also found he continued to lack the capacity to care for his children. Substantial evidence supports this finding. It also supports the finding that offering additional services would have been futile because Father was not in a position to assume custody of his children by the 12-month hearing date. In light of these findings, continuation of reunification services would have been unquestionably pointless.

It is true that Father has made efforts to reunite with his children. But "in order to prevent children from spending their lives in the uncertainty of foster care, there must be a limitation on the length of time a child has to wait for a parent to become adequate." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308; see *Daria D. v. Superior Court* (1998) 61 Cal.App.4th 606, 612 [termination of services proper where "prognosis for overcoming the problems leading to the child's dependency is bleak"].) We agree with the juvenile court that Father's refusal to engage in reunification services in the months prior to his incarceration is a strong indication that offering him additional reunification services would serve no purpose. The reality is that, notwithstanding the months of services offered to Father in this dependency proceeding as well as in the prior one, he

was still experiencing life-altering problems with substance abuse while evidencing a lack of self-awareness as to the steps he needed to take to provide a safe and stable home for his children.  The court did not abuse its discretion by declining to extend services.

Even if the juvenile court had erred and applied the incorrect standard, we would find the error harmless under the facts of this case.  Under any legal standard, the evidence does not support a possibility that the children could have been returned to Father's care by the fast-approaching 12-month deadline.

## DISPOSITION

The order is affirmed.

_____

DONDERO, J.

We concur:

_____

HUMES, P.J.

_____

BANKE, J.