Filed 10/25/21  S.D. v. Superior Court CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| S.D., <br><br>  Petitioner, <br><br>  v. <br><br> THE SUPERIOR COURT OF FRESNO COUNTY, <br><br>  Respondent; <br><br> FRESNO COUNTY DEPARTMENTOF SOCIAL SERVICES, <br><br>  Real Party in Interest. | F083154 <br><br> (Super. Ct. Nos. 19CEJ300233-1, 19CEJ300233-2, 19CEJ300233-3, 19CEJ300233-4, 19CEJ300233-5, 19CEJ300233-6, 19CEJ300233-7) <br><br><br> **OPINION** |

**THE COURT**[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Gary L. Green, Commissioner.

S.D., in pro. per., for Petitioner.

No appearance for Respondent.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Real Party in Interest.

---

[*]      Before Detjen, Acting P. J., Peña, J. and Snauffer, J.

-ooOoo-

Petitioner S.D. (mother), in propria persona, seeks an extraordinary writ from the juvenile court's orders issued at a contested 24-month review hearing (Welf. & Inst. Code, § 366.25)[1] in August 2021, terminating reunification services and setting a section 366.26 hearing for November 17, 2021, as to mother's seven children now ranging in age from three to 12 years.

Mother seeks the children's return to her custody with family maintenance services. She challenges the juvenile court's assumption of dependency jurisdiction, its failure to acknowledge her eligibility for Native American heritage through the Chitimacha Tribe of Louisiana under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) and its decision not to return the children to her under family maintenance when she completed her case plan requirements.

We conclude mother forfeited any issues regarding the juvenile court's dependency jurisdiction, proper ICWA notice was provided, and substantial evidence supported the court's decision not to return the children to mother's custody. We thus affirm the court's findings and orders and deny the petition.

## PROCEDURAL AND FACTUAL SUMMARY

*Initial Removal and Detention*

On June 28, 2019, law enforcement placed a protective hold on the children after mother expressed suicidal thoughts. She planned to drive into a pole. The maternal grandmother questioned mother's ability to care for the children and believed she may be suffering from mental illness. She said the children's father (hereafter "father") " 'runs the streets' " and watched the children at times when mother asked. A social worker

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2.

from the Fresno County Department of Social Services (department) took the children into protective custody and placed them in foster care. Mother was arrested.

The youngest child, then nine-month-old T.H., was taken to the hospital to be medically cleared because she appeared malnourished. Her head was large, and her legs, thighs and arms were thin. She weighed 12.11 pounds, placing her below the one percentile range for her age and weight. She was admitted to the hospital for severe failure to thrive which medical staff attributed to neglect because she was very hungry and quickly drank 14-ounces of formula while in the emergency room.

According to her medical records, T.H. was last seen by her primary care physician in December 2018 at three months of age. She weighed 10.56 pounds and was behind on her immunizations, having received only one set of shots. She had an appointment to see her doctor in February 2019, for a physical examination and shots but missed the appointment.

A social worker met with mother on July 1, 2019, to assess her home. Mother said she was frustrated and hopeless when she said she was going to drive into a pole because father used her car and did not put gas in it. She needed to go to the Women Infants and Children's (WIC) office and Central Valley Regional Center. She felt overwhelmed with no support system. She said she attended college in the morning and at night and father visited the home while she attended school. However, he was not supportive and no longer wanted to watch the children. He constantly rushed her when she was trying to provide for them and run errands. She explained T.H. was born "very tiny" and she knew she was underweight. She addressed her concern to the WIC office and T.H.'s doctor on June 28, 2019. She did not explain why it took her so long to seek medical advice.

Mother said she and four of the children received Social Security benefits; she for nerve damage, two of the children for " 'articulation concerns,' " one of the two for a hole in her heart and two others for attention deficit hyperactivity disorder. She denied any domestic violence with father. She was diagnosed with anxiety, major depressive

disorder and posttraumatic stress disorder and prescribed a psychotropic medication, which she was no longer taking on her doctor's advice because she had "fatty liver." The social worker found the home to be clean and appropriate with sufficient food.

On July 1, 2019, the parents and family members attended a team decision meeting (TDM) conducted by the department. The family was concerned about domestic violence in the parents' relationship because they did not communicate well with each other. Mother accused father of being emotionally abusive, which he denied. Family members also said they addressed their concerns about T.H.'s size to the parents, however, the parents neglected her by not taking her to the doctor. According to the department's report of the meeting, father argued with every person in the room and insisted he was correct. The facilitator attempted unsuccessfully to keep him on topic and to persuade him to listen. Father denied that T.H. was failing to thrive and insisted that he fed her. He believed she was underweight because she was born prematurely. At the end of the TDM, the social workers concluded voluntary family maintenance services were not an option because the children were not safe in their parents' care and a plan of care could not be made.

The department filed a dependency petition on the children's behalf alleging three counts under section 300, subdivision (b)(1). Count b-1 alleged mother placed the children at risk of harm because of her mental illness. Counts b-2 and b-3, one as to each parent, alleged T.H. was malnourished and diagnosed with severe failure to thrive because of their failure to provide her adequate medical care and nutrition. Father was identified as the presumed father of all seven children.

On July 3, 2019, the parents filed a "Parental Notification of Indian Status" (ICWA-020), stating they did not have any Indian ancestry as far as they knew.

The juvenile court ordered the children detained and ordered the department to assess father for placement and to offer the parents parenting classes, substance abuse, mental health and domestic violence assessments and recommended treatment and

4.

random drug testing. The court also ordered supervised visitation and found the ICWA did not apply.

In August 2019, mother filed an ICWA-020, indicating she may have Indian ancestry but could not identify which tribe, writing "unknown." Father also filed an ICWA-020, stating he may have Cherokee Indian heritage. They subsequently identified nine tribes through which they may have Native American heritage, including the Chitimacha tribe. The department sent a "Notice of Child Custody Proceedings for Indian Child" (ICWA-030) to the federally recognized bands of the nine tribes. None of the tribes who responded claimed the children were enrolled members of a tribe or eligible for membership.

*Jurisdiction and Disposition Hearing*

The department recommended the juvenile court sustain the allegations, remove the children from parental custody and order the parents to complete a reunification plan comprising the services offered at the detention hearing. T.H. was thriving and doing well in the care of her maternal grandmother. The older children were placed in foster care. The parents had a strong network of family support. Maternal relatives, including the maternal grandmother, completed clearances and were being assessed for placement. The parents also appeared compliant and were willing to participate in services and maintain sobriety to reunify with the children. Although they were not an intact couple, they were civil to each other and communicated effectively in order to co-parent the children. They also visited the children together and interacted well with them. The children were excited to see them.

The department was concerned, however, that mother would continue to expose her children to inappropriate and bizarre behavior and express suicidal ideation in their presence. It was also concerned neither parent would provide adequate medical care and attention to T.H.

The parents challenged the department's recommendations, arguing there was insufficient evidence to sustain the jurisdictional allegations. On December 11, 2019, the juvenile court conducted a contested hearing on jurisdiction and disposition. Mother testified she had no intention of running her car into a pole and denied saying that she did. Father attributed T.H.'s small size to being born two weeks prematurely after mother was involved in a car accident while pregnant. T.H. was underweight and spent four or five days in the hospital. The doctors never expressed concern she was not gaining weight or said she was malnourished or failing to thrive. Her weight went up and down. Father's attorney argued T.H.'s blood drawn in the emergency room tested normal and the emergency room physicians did not have her medical history available, the implication being they could not rule out causes other than neglect.

The juvenile court sustained the dependency petition in its entirety and specifically commented on the cause of T.H.'s condition, stating, "The only competent evidence before this Court as it relates to [T.H.'s] medical condition is contained in the jurisdiction/disposition report that was provided to all parties …. The Valley Children's Hospital physicians diagnosed [T.H.] with failure to thrive and neglect. [¶] Additionally, they diagnosed her with issues of malnourishment. The doctors … noticed that [T.H.] had a large head [compared to] the rest of her body, noting her head size was the 59th percentile and her height and weight was at zero percentile. This Court does not find that there has been any competent evidence to refute that claim …."

The juvenile court ordered the children removed from parental custody, ordered the parents to participate in reunification services and set the six-month review hearing for May 20, 2020.

Father appealed from the juvenile court's dispositional order. After reviewing the juvenile court record, father's court-appointed counsel filed a letter pursuant to *In re Phoenix H*. (2009) 47 Cal.4th 835 informing this court he could not find any arguable issues to raise on father's behalf. Father filed a letter brief challenging the jurisdictional

6.

findings but was unable to make a good cause showing that an arguable issue existed on the record and the appeal was dismissed. (*In re T.D. et al.* (July 6, 2020, F080464) [nonpub. opn.].).)[2]  Mother did not appeal.

*Reunification Period*

By the six-month review hearing, the children were placed with relatives.  The parents were separated and unemployed, but mother was attending city college.  Father had completed his case plan and mother was making significant progress.  They visited the children regularly but had difficulty managing all seven of them.  The six-month review hearing was continued and conducted on June 24, 2020.  The juvenile court found the parents made significant progress and continued services to the 12-month review hearing on August 5, 2020.

The parents maintained their significant progress over the ensuing six months.  Mother did not require substance abuse treatment and although she tested positive for opiates, she produced a prescription that explained the results.  As a result of her domestic violence assessment, she was referred for a victims group which she completed in November 2019 and a 52-week child abuse intervention program (CAIP).  She completed 14 of the 52 sessions.  She was also participating in mental health therapy through Uplift Family Services and completed a cultural broker program "Parenting a Child Who Has Experienced Trauma" class, which she completed in December 2019.  However, the class was not approved by the court or the department.  The department initiated a referral for the "Incredible Years" parenting program through Exceptional Parents Unlimited (EPU), a department approved program, in January and May 2020, but mother insisted she already satisfied the parenting requirement by completing the cultural broker program.

---

[2]  On our own motion, we take judicial notice of our case file and opinion in case No. F080464.  (Evid. Code, §§ 452, subd. (d), 459, subds. (a)−(c).)

Despite the parents' progress in their services plans, the department recommended the juvenile court continue reunification efforts but not return the children to parental custody because the parents denied and minimized the need for departmental intervention and had difficulty managing all seven children.  In addition, mother demonstrated reckless behavior by speeding past and cutting off the care providers in heavy rain after a visit and father lacked empathy toward the children's needs during visits.  Mother also punched father's girlfriend in the face, visited the care providers' home outside of the visitation schedule and allegedly brought a gun to the visitation center.  As a result of these incidents, mother's therapist requested a psychological evaluation.  The department believed the parents' prognosis for reunifying was good but wanted to monitor their consistency in reunification services, employment, and ability to balance their time with the children.

On August 5, 2020, at the 12-month review hearing, the juvenile court found the parents made significant progress in their services plans and continued reunification services to the 18-month review hearing which the court set for December 23, 2020.  The court ordered a psychological evaluation and risk assessment for mother.  Because of the COVID-19 pandemic, mother was unable to complete a psychological evaluation through Uplift Family Services.  She was ordered to participate in a psychological evaluation through the criminal court.  However, there is no evidence in the record that she completed such an evaluation.

The juvenile court continued the 18-month review hearing until January 27, 2021.  By that time, mother had five of the children in her care on an extended visit and although she had yet to complete an approved parenting class, the CAIP and mental health therapy, the department believed her prognosis for reunifying was high with continued services.  Father, on the other hand, had not visited the children since September 2020 or contacted the department to reinstate visitation or to inquire about the children's well-being.

On January 27, 2021, at the 18-month review hearing, the juvenile court found there was not a substantial probability the children could be returned to mother's care and continued reunification services for her. The court terminated reunification services for father. The court ordered extended visits for all the children with mother, vacated its order for random drug testing, granted the department discretion to spot test mother and set a 24-month review hearing for June 23, 2021.

In April 2021, a social worker made an unannounced visit to investigate a report that mother's then three-year-old son returned home from a visit with mother with scratches all over his body.[3] Mother said the scratches were " 'from the cat' " or from her five-year-old son (the five-year-old) as " 'boys will be boys.' " The social worker told mother any injuries had to be reported to determine if the children required medical attention. The following month, a relative reported that mother's 10-year-old daughter (the 10-year-old) and the five-year-old had " 'knots' " on their foreheads. A social worker made an unannounced visit to the home and observed piles of dirty clothes in every room, dishes piled high in the sink, food, garbage, and paint scattered all over the floor. There was a small black refrigerator that appeared to be broken with old food and roaches coming out of it. The social worker observed the 10-year-old had two large bumps on her forehead and a scar on her forehead and chin. Mother had no explanation for her injuries. The five-year-old had a bump on his forehead. He said he had scars on his hands and feet from broken glass in the home. Mother showed the social worker a picture of her six-year-old daughter taken on May 4, 2021, with a large pus-filled sac under her eye. Mother said it was from rubbing her eye incessantly. Asked whether mother had sought medical attention, mother stated there was an appointment in June. The social worker told mother she was temporarily stopping the extended visit and the

---

[3] The three-year-old and the 12-year-old were on liberal visits with mother and their siblings during the weekends.

children would stay with relatives. Mother refused to relinquish the children and asked the social worker to leave. The police were unwilling to forcefully remove the children for lack of exigent circumstances. Five days later, mother relinquished the children to the social worker.

In its report for the 24-month review hearing, the department assessed mother's progress over the prior five months as "minimal" and opined the children could not be safely returned to her custody. She had yet to complete a court-approved parenting class and refused to spot test, stating "it [was] best not to ask her." She successfully completed mental health services in February 2021 and completed the 52-week CAIP in May 2021, but could not receive a certificate because she refused to pay her $50 balance for two absences.

Although mother actively participated in her services and had a strong bond with the children, her behavior had not changed, and she had not remedied the problems that required their removal. The department recommended the juvenile court terminate her reunification services and set a section 366.26 hearing.

*24-Month Review Hearing*

Mother objected to the termination of her reunification services and requested a contested hearing. The court reduced mother's visitation from extended to supervised and set a contested review hearing, which was conducted on August 4, 2021.

Mother testified she completed the 12-week cultural broker parenting program and the 15-week "Incredible Years" parenting class through EPU. She provided the social worker certificates of completion. She learned about posttraumatic stress syndrome and attachment with children in the cultural broker program. She learned about dealing with children and trauma and how to identify signs and symptoms of trauma and interact and play with children. She learned about working with teachers to prevent problems, utilizing time out and effective communication, developing friendship and coping skills, and learning to regulate emotions. She did not specifically learn about failure to thrive

10.

but disputed that T.H. had failure to thrive. T.H. was a high-risk pregnancy because she was mother's seventh child. Mother was sent to a specialty clinic where an ultrasound revealed T.H. had cerebral palsy. Mother also learned how to identify child abuse in her parenting classes. In mental health counseling, mother learned about relating to the children and exercising patience. She completed the CAIP and provided the social worker the certificate of completion. Mother denied the social worker asked her to spot test and she refused.

Mother believed the extended visit went well but the children had to stay indoors and even though she supervised them constantly, they got injured. Their extended visit also caused her financial problems because she was not provided any additional money for them and had to use her own funds. She was unemployed but expected to be employed within a few weeks because she had one week left to complete a pre-apprentice construction training program. She did not take the children to the doctor during their extended visit because she did not have their medical insurance cards.

Social worker Kate Martell testified mother did not complete the parenting class through EPU. When somebody completed a program, the department received the certificate from the program. Martell could have received the certificates from EPU but not recall receiving them. The last time she asked mother to drug test was on May 25, 2021, and mother refused. The state of the children and the cleanliness of mother's home were concerns she had about returning the children to mother's custody.

Mother's attorney argued for family maintenance services because mother completed her case plan requirements with significant progress and could ensure the children's safety.

*Juvenile Court's Ruling*

The juvenile court complimented mother's perseverance but had concerns about her ability to safely parent the children, stating:

11.

"Mother has not identified outside support, and she has not identified a plan. I don't know how anybody on their own can take care of seven children, especially the children of this age and with their various needs. We have no record of current sobriety. Although on the flip side, we don't have any indication of drug or alcohol use. The assurance of sobriety would have gone a long ways. We don't have that."

"The [c]ourt is also concerned and finds that the mother seems to lack an insight on the ability for her to care for this number of children in the home and maintain their safety, their health, medical appointments, educational needs. I think it would be overwhelming even under the best of circumstances, and it certainly is not likely to go well under these circumstances."

"Mother … had a track record of extended visits. And, unfortunately, it did not go well for mother and does not demonstrate that she has the ability to care for all these children at one time. In fact, she never had all of them, as I understand it, at one time. At most, she had five."

"In addition, and this is of key concern, if the children were returned to her, I have no assurance that they would not be removed again. And that's the last thing we want. There is also no evidence that she could put into practice the things that she apparently learned, which goes to a lack of insight. I'm also concerned about financial ability. And this is not meant to be a criticism. But I don't know, quite frankly, based on her circumstances how these children can be adequately cared for, all their medical, day-to-day emotional, physical needs. It's a concern."

"And, finally, … I do find that mother has failed to adequately take accountability. There has been multiple times where she's blamed the [d]epartment or [the social worker] for criticisms, concerns that have arisen."

The juvenile court found that she was provided reasonable reunification services but made minimal progress. The court terminated reunification services and set a section 366.26 hearing. This petition ensued.[4]

---

[4] Father did not file a writ petition.

12.

**DISCUSSION**

*Mother Forfeited Any Challenge to the Juvenile Court's Jurisdictional Findings and Removal Orders*

Mother disputes the allegation that T.H. was diagnosed with failure to thrive, arguing there was no documentation to support it other than the doctor's opinion. The doctor could not have made the determination, she argues, because he did not have T.H.'s medical history. As a result, her relatives have shamed her and invaded her family. She further contends her home was clean which should have been a mitigating factor to removing the children. She appears to refute that she planned to run her car into a pole, asking, "but why [am I] still standing?" We construe her arguments as a challenge to the juvenile court's jurisdictional findings and removal orders.

A juvenile court may exercise its dependency jurisdiction over a child if it finds, by a preponderance of the evidence, the actions of a parent brings the child within one of the statutory definitions set forth in section 300 and its subdivisions. (*In re Joshua G.* (2005) 129 Cal.App.4th 189, 202.) Here, the juvenile court adjudged the children minors described under section 300, subdivision (b)(1), which applies as relevant here where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent … to adequately supervise or protect the child, or … by the inability of the parent … to provide regular care for the child due to the parent's … mental illness …." (§ 300, subd. (b)(1).) In so doing, the court specifically found that mother's "inappropriate, bizarre and aggressive" behavior at the time of her arrest placed the children at a substantial risk of suffering physical harm and neglect. The court also found that T.H. was diagnosed with severe failure to thrive and mother's failure to provide T.H. with adequate nutrition and medical care placed T.H. at a similar risk of harm if she were returned to the home.

If the juvenile court finds a statutory basis for dependency jurisdiction, it may order the child removed from parental custody at the dispositional hearing on a finding by

13.

clear and convincing evidence that returning the child to parental custody would place the child in substantial danger and there are no reasonable means to protect the child short of removal. (§ 361, subd. (c)(1).)

Any challenge to the juvenile court's jurisdictional findings and dispositional order removing the children comes too late. Section 395 provides in part: " 'A judgment in a proceeding under Section 300 may be appealed from in the same manner as any final judgment, and any subsequent order may be appealed from as from an order after judgment; …' In a dependency proceeding, the dispositional order constitutes a judgment. [Citations.] A jurisdictional finding, while not appealable, may be reviewed in an appeal from the dispositional order. [Citation.] But appellate jurisdiction is dependent upon the filing of a timely notice of appeal. [Citations.] 'An appeal from the most recent order entered in a dependency matter may not challenge prior orders, for which the statutory time for filing the appeal has passed.' " (*In re Megan B*. (1991) 235 Cal.App.3d 942, 950.)

Here, mother litigated the evidence offered by the department to support the juvenile court's exercise of its jurisdiction, including evidence that T.H. was failing to thrive and mother stated she was going to drive into a pole. Mother did not prevail as the juvenile court sustained the allegations, adjudged the children dependents of the court, and removed them from mother's custody. Mother did not thereafter file a notice of appeal to challenge the court's findings and orders. Consequently, she forfeited those issues. The court's jurisdictional findings and removal orders are now final and not subject to our review.

*The Chitimacha Tribe Was Provided Proper Notice of the Dependency Proceedings and the Children Were Not Eligible for Tribal Membership*

The ICWA requires notice to Indian tribes "in any involuntary proceeding in state court to place a child in foster care or to terminate parental rights 'where the court [or social worker] knows or has reason to know that an Indian child is involved.' " (*In re*

14.

*Isaiah W*. (2016) 1 Cal.5th 1, 8.)  The tribe to which the child belongs, or in which the child may be eligible for membership, must receive "notice of the pending proceedings and its right to intervene."  (*In re H.B*. (2008) 161 Cal.App.4th 115, 120.)

Under the ICWA, an "Indian child" is an unmarried minor who is either (1) a member of a tribe or (2) eligible for membership in a tribe.  (25 U.S.C. § 1903(4).)  The purpose of an ICWA notice is to enable the tribe to determine whether the minor is a member or eligible for membership.  (*In re D.W*. (2011) 193 Cal.App.4th 413, 418.)

Mother identified the Chitimacha Tribe of Louisiana, among others, as one in which she may have Native American heritage.  The department sent the tribe notice of the dependency proceedings and the tribe responded, stating that none of the children were enrolled members of the tribe.

Mother acknowledges the children are not enrolled members of the Chitimacha Tribe of Louisiana but asserts that does not mean they are ineligible.  She does not, however, argue that the department provided inaccurate information in the notice to the tribe that would prevent the tribe from establishing the children's eligibility or that the information the department provided was incomplete.  (*In re D.W*., *supra*, 193 Cal.App.4th at p. 418.)

" ' "Contentions supported neither by argument nor by citation of authority are deemed to be without foundation, and to have been abandoned." [Citations omitted.]' [Citation.]  Nor is an appellate court required to consider alleged error where the appellant merely complains of it without pertinent argument." (*Berger v. Godden* (1985) 163 Cal.App.3d 1113, 1119−1120.)

Inasmuch as mother asserts the children may be eligible for membership in the Chitimacha tribe but does not relate her assertion to any error by the juvenile court, we deem the issue abandoned.

*Substantial Evidence Supports the Juvenile Court's Orders Terminating Reunification Services*

The purpose of reunification services is to place the parent in a position to regain custody of the child. (*In re Karla C*. (2010) 186 Cal.App.4th 1236, 1244.) "The foundation and central, unifying tool in child welfare service is the [reunification] plan. The [reunification] plan must provide for the child's care and case management and must provide services that facilitate both return and, concurrently, permanency." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2020 ed.) Disposition Hearing, § 2.129[4].)

The duration of reunification services is set by statute. Court-ordered services may be extended up to a maximum time period not to exceed 24 months after the date the child was originally removed from parental custody. (§ 361.5, subd. (a)(4)(A).)

At the 24-month review hearing, the juvenile court must return the child to the physical custody of the parent unless the court finds, by a preponderance of the evidence, that the child's return would create a substantial risk of detriment to the child's safety, protection or physical or emotional well-being. (§ 366.25, subd. (a)(1).) If the child is not returned to parental custody, the court must set a section 366.26 hearing to establish a permanent plan for the child. (§ 366.25, subd. (a)(3).)

"[T]he decision whether to return the child to parental custody depends on the effect that action would have on the physical or emotional well-being of the child." (*In re Joseph B*. (1996) 42 Cal.App.4th 890, 899.) A parent's successful participation in reunification does not supplant the requirement that the juvenile court carefully weigh the risk of detriment that reunification may have upon the children. (*Id*. at p. 901.)

"[S]imply complying with the reunification plan by attending the required therapy sessions and visiting the children is to be considered by the court; but it is not determinative. The court must also consider the parents' progress and their capacity to meet the objectives of the plan; otherwise the reasons for removing the children out-of-

home will not have been ameliorated." (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143.)

Mother contends the juvenile court should have returned the children to her custody under family maintenance because she completed all her court-ordered services and because the children wanted to return to her custody. She faults the department for not providing her financial support while they were with her on the extended visit.

We conclude substantial evidence supports a finding it would be detrimental to return the children to mother's custody.[5] Despite mother's substantial compliance with her services plan,[6] she had yet to demonstrate she could safely parent even five of the children. After four to five months with mother on an extended visit, the home was chaotic, unsanitary, and dangerous. The children were injuring themselves and each other and mother was not seeking medical attention for them. Instead of asking her family who had been so helpful to her in the past for support, she alienated herself from her family. Further, she failed to allay any concerns about her sobriety by refusing to drug test. In many respects, mother's circumstances had not changed in the two years since the children were removed despite extensive reunification services.

Having concluded it could not safely return the children to mother's custody, the juvenile court had no choice but to terminate her reunification services and set a section 366.26 hearing.

We find no error.

---

[5] We find no express finding of detriment on the record. Nevertheless, "we will infer a necessary finding provided the implicit finding is supported by substantial evidence." (*In re S.G.* (2003) 112 Cal.App.4th 1254, 1260.)

[6] Mother had yet to complete a department-approved parenting program and refused to drug test on demand.

**DISPOSITION**

The petition for extraordinary writ is denied.  This court's opinion is final forthwith as to this court pursuant to California Rules of Court, rule 8.490(b)(2)(A).