Filed 2/5/26  M.M. v. Superior Court CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| M.M.,<br><br>  Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>  Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>  Real Party in Interest. | A174850<br><br>(Contra Costa County Super. Ct. No. J2500177) |

  In this extraordinary writ proceeding, M.M. (mother) challenges the juvenile court's order entered at the 12-month review hearing terminating her reunification services and setting a hearing under Welfare and Institutions Code[1] section 366.26 to determine a permanent plan for her one-year-old son Mateo.  She contends that there is insufficient evidence to support the trial court's finding that the Contra Costa County Children and

---

  [1] All statutory references are to the Welfare and Institutions Code.

Family Services Bureau (the Bureau) provided her with reasonable reunification services. We deny the writ.

## BACKGROUND

On June 10, 2024, the Napa County Health and Human Services Department received a referral regarding mother, who was 38 weeks pregnant with Mateo, and Mateo's father. "The reporting part[y] stated that the mother and her boyfriend are in [a] domestic violence relationship and have verbally and physically fought in front of [Mateo's 5-year-old half-sibling]. The reporting party reports that [the sibling] has witnessed the mother's boyfriend push her against the wall, throw furniture and hit the mother. It was also reported that [the sibling] was suspended from [transitional kindergarten] due [to] violent behaviors and for throwing furniture and biting his teacher. The reporting party believes that [the sibling] is exhibiting behaviors he sees at home. The reporting party also stated that [the older sibling's] biological father was told to get a custody order and restraining order against the mother and had planned to go to court today."

Two weeks later, following Mateo's birth, the Napa County Health and Human Services Department filed a petition alleging under section 300, subdivision (b)(1), that mother has unmanaged mental illness which impairs her ability to provide adequate care, supervision and protection for Mateo and on several occasions Mateo was exposed, in utero, to acts of intimate partner violence. The petition also alleged under section 300, subdivision (j), that Mateo's older sibling experienced emotional

2

abuse and neglect in that he was exposed to multiple instances of domestic violence involving mother and that Mateo was at similar risk of neglect. Mateo was detained pending the jurisdiction hearing.

The report submitted to the court in advance of the jurisdiction hearing detailed the family's history with the social services agency that preceded the filing of the present petition. In December 2023, while mother was pregnant with Mateo, the agency received referrals on two occasions after arguments between mother and father turned physical and police were called. One of the incidents is described as follows: "The mother went to pick up [father] from the bar and became upset because he did not want to go home. When the couple returned to the apartment an argument begun [sic], which turned physical. The boyfriend grabbed the mother, wrapped his arm around her neck and covered her mouth. The mother broke free after two minutes and called law enforcement. Law enforcement noticed [Mateo's older sibling] sleeping in the living room and it was reported that the argument and physical altercation took place in the bedroom. The boyfriend was arrested and the mother said she was leaving the residence to stay with her grandparent."

Mother moved out of father's home and was residing with her grandparents, but on May 31, 2024, father called the police to report that mother would not leave his home. Mother claimed that she and father got into an argument when she was in his home to pick up her remaining belongings. He yelled in her face and pushed her up against a wall. When the officer arrived,

3

"[b]oth the mother and father claimed that they were pushed by each other. . . . [T]he officer made notice that he has respond[ed] to the residence multiple times regarding disturbance of the peace reports which involved both the mother and father."

In July 2024, mother told the social worker that she was sleeping in her car but still used father's apartment to shower and transports him wherever he needs to go. She acknowledged the social worker's concerns about the prior domestic violence, and explained that was why she was sleeping in her car. Mother was open to participating in services to get her children back and hoped to be able to co-parent with father.

In August 2024, the Napa County Superior Court found the allegations of the petition true, continued Mateo's out-of-home placement, and ordered reunification services for mother.[2] The case plan approved by the court includes the following explanation of the social service agency's concerns in this case: "Mateo may be physically harmed if the parents engage in physical fighting, including strangulation, hitting, and throwing furniture, while Mateo is in their care, as he is non-mobile and entirely dependent upon the parents, increasing his likelihood of being in close proximity to the parents' fighting. Further, Mateo may be emotionally harmed if he witnesses ongoing violence in the home, resulting in emotional dysregulation and fear, as this impact has occurred with another child previously in the home.

---

[2] Reunification services were also initially ordered for Mateo's father but were terminated at the first review hearing. Father is not a party to these writ proceedings.

4

Mateo's basic needs of safety, shelter, nutrition, and ongoing care may go unmet if the parents continue to abuse alcohol and engage in violence." Mother's service objectives were to develop and follow her domestic violence prevention plan; work with her support network to assist her in meeting the minor's needs; follow her support plan and utilize the plan on a daily basis to meet the minor's needs and manage mother's mental health while caring for the minor; update the plan as needed to meet the needs of the minor; demonstrate meeting the minor's basic needs while managing her mental health symptoms; demonstrate at least three to five coping strategies to manage her mental health while caring for the minor, and actively work with her mental health treatment team and support network to utilize her coping strategies and manage her mental health symptoms. Mother's responsibilities under the case plan were to participate in Child and Family Team ("CFT") meetings; participate in and complete a codependency group and provide the social worker with proof of completion; participate in therapy services and sign authorization releases of information; work with support services to develop her insight into intimate partner violence and triggers to violence; and maintain a domestic violence response plan and work with the social worker to identify other strategies to maintain the safety of her and the minor.

In advance of the six-month review hearing, mother's CASA filed a report indicating that mother had participated in

services through NEWS and COPE.[3]  The report further indicates that mother was attending CFT meetings and had a support network, was participating in mental health services, had participated in parenting classes, had identified coping strategies to manage her emotions, was employed, and had obtained temporary housing.

Just before the hearing, the social worker reported that mother was no longer living in Napa County and requested that the case be transferred to Contra Costa County where mother was living at the time.  The report indicated that the transfer of mother's benefits to Contra Costa County was pending as of the date of the hearing.  While mother's access to public health services through Napa County had been closed as a result of her move, mother was still "connected to her NEWS Advocate" and was receiving therapy services with the same provider that she had been referred to in Napa County.

In February 2025, following a hearing on the transfer motion and an uncontested six-month review hearing, the court found that the Napa County social services agency had "complied with the case plan by making reasonable efforts to return the child to safe home through the provision of reasonable services designed to aid in overcoming the problems that led to the initial removal and continued custody of the child and by making reasonable efforts to complete whatever steps are necessary to

_____

[3] Although not explained in the report, the record reflects that NEWS provides domestic violence prevention services and case management and that COPE provides services "to help with parenting and home visits with the baby."

6

finalize the permanent placement of the child." The court found further that mother had made adequate progress on her case plan and continued reunification services. The court also issued an order transferring the case to Contra Costa County.

In March 2025, a transfer-in hearing was held in Contra Costa Superior Court and mother was appointed new counsel. A 12-month review hearing was scheduled for July 2025.

In July 2025, the Bureau prepared a report recommending termination of reunification services. The report concludes that mother believes that participation in her case plan is enough for the return of her son to her custody. She "does not understand the safety concerns and is merely completing tasks but lacks the behavioral change that proves she can hold safety for herself as well as her infant child."

The report states that mother first met with the assigned social worker on April 11, 2025 to discuss the case plan and the Bureau's expectations. During that meeting, mother minimized the prior domestic violence by father and claimed the reports made him "look like a bad guy." She told the social worker that she felt ready to have unsupervised visitation with Mateo and that she had been advised by her Napa County social worker that "by going to another County she would have a better chance to have the child returned to her care." The Contra Costa County social worker advised mother that the safety concerns identified by the agency in Napa County were serious and would need to be alleviated.

According to the report, on April 17, the social worker was notified that mother had showed up to Mateo's medical appointment with father and pleaded with the caregiver to allow him to see the child. The caregivers were concerned that mother arrived at the medical appointment with father and that she requested that the social worker not be notified. When the social worker spoke with the mother regarding the incident, mother confirmed that he was there. The following day, mother informed the social worker that she was no longer residing in Contra Costa County and had returned to Napa.

The report indicates that the following services were provided to mother since transfer of the case. Mother was referred to an online, weekly codependency group to address the concerns that she had an unhealthy enmeshment with father. Mother was continuing to receive individual therapy from her Napa County provider. The report explained that mother "expressed that she wanted to stay connected to her providers in Napa[, e]ven though the undersigned explained that similar services can be provided in Contra Costa." According to the report, mother told the social worker that "she graduated from services and does not believe that there is anymore [sic] for her to learn." The report adds that "[o]nce the mother relocated back to Napa, she requested the undersigned to contact Expressions of Hope in Napa for assistance with her storage fees. When the undersigned contacted the agency, they reported that they have helped [mother] above and beyond their usual funding availability and can no longer provide anymore [sic] assistance to

8

her." The report also indicates that while mother was still residing in Contra Costa County, the social worker applied for rental assistance through the Bringing Families Home program but the referral was denied due to the program losing its funding for services.

The report indicates that mother has supervised visitation twice a week. She was initially allowed to walk with the baby around the block, but walks were "ceased due to potential safety concerns" when the Bureau was alerted that Mateo's father was in the parking lot in mother's car.

The review hearing was conducted over the course of four days in late 2025: September 3; October 1; October 29; and November 5. On the first day of the hearing, the Contra Costa social worker testified that mother was participating in services in Napa County before the case was transferred, but that she had not sought out information about the specific programs after mother had told her they were completed. Later in her testimony, however, she explained that she had spoken with the Napa County social worker after her first meeting in April with mother.

The Contra Costa social worker testified that mother maintained contact with her throughout the reporting period and had attended a CFT meeting with the Bureau in May. Mother had provided names for the four people in her support network, some of whom had participated in the CFT meeting, but the social worker had not spoken to them individually.

9

The social worker indicated that, a week before the hearing, she had received a letter from mother's individual therapist about her progress in therapy. When the social worker discussed the letter with mother, the social worker learned for the first time that mother was having trouble with her medical coverage. At that time, mother asked the Bureau to pay for her therapy. The social worker testified that she told mother, "we'll see what happens with court." The social worker later confirmed, however, that the Bureau was making arrangements to pay for mother's therapy through the end of the review hearing. The social worker testified that she had spoken with the therapist and confirmed that mother had been participating regularly.

The social worker testified that, according to mother, she was regularly seeing her psychiatrist and was on medication. As of the first day of the hearing, however, mother had not provided a release of information for her medical doctor and the social worker had not confirmed mother's statements. After the first day of the review hearing, mother signed a release for her psychiatrist and before the second day of the hearing, the social worker was able to confirm that mother had met regularly with her as well.

The social worker reported that she received mother's new address in Napa County in April, but that she had not attempted a home visit before the hearing. Between the first and second days of the review hearing, the social worker attempted an unannounced visit, but mother was not home.

10

The social worker indicated that when she first met with mother, she asked for a copy of the domestic violence prevention plan that mother prepared prior to transfer of the case, but she had not received it. The social worker asked mother for it again just before the review hearing.

The social worker explained that she did not make additional referrals for mother in Contra Costa County because, other than the codependency group, "[a]ll the other services were already the Napa ones that she had connection with." Mother acknowledged that she told her Contra Costa County social worker that she had completed all of the services that were required in Napa County other than participation in a codependency group and did not ask for any additional services.

The court also admitted into evidence a letter written by an extended family member indicating that she saw mother and father together at a restaurant on April 17 and, more recently, while driving on August 8.

In her testimony, mother claimed that she was no longer in a relationship with Mateo's father "[b]ecause he basically wasn't doing what he needed to do to get our son back, and we were trying to do the case together. But when he wasn't going to program and stuff, I realized that I was going to get my son taken, and I did not want that to happen. I wanted to have a fair chance to get my son back." She also acknowledged that she asked Mateo's caregivers not to report the father's presence at the medical appointment because she "knew he wasn't allowed to be a part of the doctor's appointment." She conceded, however,

11

that she was still in contact with him and that he has helped her "get food and things for Mateo that [she] needed." She last saw him in July or August. She "felt safe enough to be around him" because he was not drinking and was going to counseling.

Mother testified that she met weekly with her NEWS case worker. She developed a domestic violence safety plan and discussed how domestic violence affects families and children. Mother acknowledged that through NEWS she received education on various domestic violence concepts including the "cycle of violence," the "power and control wheel," how violence effects children, "Understanding ACES [Adverse Childhood Experiences]," and "parenting to prevent and heal ACES." She had not, however, attended any domestic violence prevention classes. She explained that she thought her "NEWS worker" had signed her up for the class and that she was on a waitlist. She explained, "I was waiting for the classes to start. I was told that they were supposed to be in—starting this month. But then when I reached out in the beginning of this month, like right after the last court date, I had reached out and they told me that they had already started in September. And so I asked them why I wasn't notified, and they said they didn't know. [¶] So I tried to reach out to another program called Alternatives For Better Living. And they told me it was $150 per class—or to start with them and then $60 a class, and I had reached out to [the Contra Costa County social worker] to see if the Department would pay for that, and she told me that she had to get an invoice from them for them—for me to give them her information; I did that. And I

12

had followed up with her, I want to say a few weeks later, and she had told me that her supervisor told me that it depended on what happened in this case—or this court date, if they could pay for it or not."

Mother also testified that she had not attended a parenting class and that she was trying to get into one, but the Contra Costa County social worker told her it also depended on what happened at the review hearing. She acknowledged, however, that she had received some information on parenting skills through her NEWS counselor.

In closing argument, the parties disputed whether the social services agencies had provided reasonable services with regard to domestic violence education. Ultimately, the court issued an order terminating reunification services and setting a section 366.26 hearing. The court found that reasonable services had been provided by the social services agency but that mother had not made significant progress in resolving the domestic violence issues that brought her to court. Specifically, the court stated, "From all of the evidence that I've been provided, she was provided services through the News program on domestic violence, on ACES. There were one-on-one services. She has had therapy, consistent therapists throughout the entire . . . reunification period of time, where domestic violence and her relationship with the father has been discussed. [¶] [The Contra Costa County social worker] has asked for information from the mother, and Mother has not been forthcoming with that information. It's hard for [the social worker] to help the mother

13

when she's not being forthcoming with her. When Mother is saying that she's completed everything and it's a transfer of a case, this Court recognizes the difficulty of a case being transferred in and the new social worker trying to get up to speed. She was relying and had faith in Mom that she would be honest with her about what she had done and what was left to be done, and it looks like Mom was not honestly [sic] with her about that." The court observed that through the NEWS program and mother's individual therapy she had learned about the cycle of violence and domestic violence, but that her testimony at the hearing reflected "very minimal progress" in applying what she learned. The court found that mother knew that she was not supposed to bring father around Mateo and continued to do so. The court concluded that mother "has not been truthful" about the domestic violence and continued to maintain a relationship, whether romantic or not, with father, who "has not done anything to try and better himself to alleviate the domestic violence that brought them to the court." Lastly, the court found that despite almost 18 months of services, there was no substantial probability that Mateo can be returned to mother's care.

## DISCUSSION

Mother contends there was insufficient evidence to support the trial court's finding that reasonable reunification services were provided.[4] We disagree.

---

[4] This argument constitutes Mother's sole basis for challenging the court's orders at the 12-month review hearing. Our review is limited to contentions raised in the briefs. (*Connell v. Superior Court* (1997) 59 Cal.App.4th 382, 394.)

14

The purpose of reunification services is to place the parent in a position to gain custody of the child. (*In re Karla C.* (2010) 186 Cal.App.4th 1236, 1244.) To that end, the agency must devise a services plan tailored to the unique needs of the family and make a good faith effort to help the parent access those services. (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) "The 'adequacy of reunification plans and the reasonableness of the [social services agency's] efforts are judged according to the circumstances of each case.' [Citation.] To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .' [Citation] 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426.)

Here, the court identified the parents' domestic violence as the main issue that brought the family to court and terminated services based on mother's failure to make significant progress in resolving that issue. Mother acknowledges that the Napa County social services agency provided reasonable services regarding domestic violence support while it was supervising her case. She states that "her Napa County social worker referred her to

15

domestic violence support groups.  While in Napa County, mother attended NEWS and developed her domestic violence safety plan, learned about the cycle of domestic violence, and understood why she was in a domestic violence relationship."  Mother argues, however, that there is insufficient evidence that the Bureau provided reasonable services after transfer of the case to Contra Costa County.

Mother faults the Contra Costa County social worker for referring her only to the codependency support group and for failing to sign her up for domestic violence classes.  But the record reflects that mother claimed to have completed all additional relevant elements of her case plan while living in Napa County and expressly asked to continue services with NEWS, where she had a case worker managing her programming.  The social worker provided a referral to a codependency group and reasonably relied on the continued provision of services through NEWS and mother's individual therapist.  Mother acknowledged that, while there was apparently some sort of mishap, her NEWS case worker told her she was signed up for the waitlist for the domestic violence classes.  As the trial court observed, the provision of services in this case was complicated by the transfer of the case after the six-month review and mother's position on services taken at the first meeting with the social worker.  The Bureau's decision not to make additional referrals for domestic violence programming and to instead rely on continued services by her existing domestic

violence service provider was reasonable under the circumstances.

Moreover, the record reflects that the services provided the information mother needed to learn in order to have Mateo returned to her custody—the dynamics of domestic violence relationships, how domestic violence impacts children, and specifically that she was involved in a domestic violence relationship. Her claim, asserted for the first time in the writ petition, that the services were inadequate because her providers may not have told her that she should not have contact with father was not raised at the review hearing and is not persuasive. The trial court found that mother continued "to bring [father] around her and attempt[ed] to bring him around the baby, despite the fact that he had not tried in any way to fix the issues that brought him to the court" and that "Mom knew that she wasn't supposed to bring him around." The record amply supports that finding.

Mother's remaining arguments are similarly unpersuasive. Mother argues that the services cannot be found reasonable because the social worker only belatedly asked for releases of information from her treating therapist and psychiatrist. The delay by the social worker in timely obtaining releases of information delayed confirmation of mother's participation in services but did not impact the provision of services themselves. There is no dispute that mother participated in therapy and was compliant with her medication throughout the proceedings.

17

Mother also faults the social worker for not making a referral to a parenting class. She acknowledges that completion of a parenting class was not a specific element of her case plan but argues that the classes are "directly tied to mother demonstrating meeting the minor's needs." The record in this respect is somewhat confusing. The report submitted in advance of the six-month review hearing and that was provided to the Bureau in the transfer-in packet expressly states that "mother has participated in parenting classes." At no point prior to the review hearing did mother request additional parenting classes or suggest that, contrary to the report, she had not participated in a parenting class. Given that parenting classes were not an express requirement under the case plan, the Bureau's purported failure to refer her to parenting classes is not unreasonable.

Next, mother faults the Bureau for failing to complete a home visit. She argues: "A standard practice in determining whether a minor can be returned to the custody of the parent is to evaluate the home of the parent. Here, the social worker did not bother to visit Mother's home" prior to the review hearing. Putting aside whether the Bureau should have attempted to conduct a home visit sooner, the failure to do so does not establish that reasonable services were not provided. A lack of stable, safe housing was not one of the problems identified by the court as leading to the loss of custody.

Finally, mother contends that the Bureau failed to provide reasonable services because it did not authorize payment for her therapy. The record reflects, however, that mother received

18

services despite the lack of payment.  Moreover, the payment issue only arose as of August 1, and the social worker was not informed of the issue until a week before the review hearing.

Accordingly, we affirm the order terminating reunification services and setting the section 366.26 hearing.

## DISPOSITION

The petition for extraordinary writ is denied on the merits. (§ 366.26, subd. (*l*)(1)(c); Cal. Rules of Court, rule 8.452.)  The request for a stay is denied.  Our decision is final as to this court immediately.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)

GOLDMAN, J.

WE CONCUR:

BROWN, P. J.
STREETER, J.

19